[Cite as *In re D.R.*, 2018-Ohio-3434.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### SHELBY COUNTY

IN RE:

                                            **CASE NO. 17-17-21**

    **D.R.**

**ADJUDGED DEPENDENT CHILD.**

**[JOSHUA R. - APPELLANT]**                 **O P I N I O N**
**[FELICITY B. - APPELLANT]**

**Appeal from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2015 NEG 0006**

**Judgment Affirmed**

**Date of Decision:   August 27, 2018**

**APPEARANCES:**

    *Kristina M. Morris* **for Appellant, Felicity B.**

    *Jeremy M. Tomb* **for Appellant, Joshua R.**

    *Anne K. Bauer* **for Appellee, SCDJFS-CSD**

**SHAW, J.**

{¶1} Appellants, Felicity B. and Joshua R., appeal the November 6, 2017 judgment of the Shelby County Court of Common Pleas, Juvenile Division, granting the motion for permanent custody of their child, D.R., filed by Appellee, the Shelby County Department of Job and Family Services-Children Services Division, (hereinafter the "Agency").

{¶2} D.R. was born in December of 2014 to Felicity and Joshua. Joshua was later confirmed to be D.R.'s biological father through genetic testing.

*Procedural History*

{¶3} On February 2, 2015, the Agency filed a complaint alleging nearly two-month-old D.R. to be a neglected and dependent child pursuant to R.C. 2151.03(A)(2) & (3) and R.C. 2151.04(A),(B) & (C). In an affidavit accompanying the complaint, the Agency alleged that less than a week after his birth, it had received reports indicating that D.R. was "under-fed and exhibiting symptoms of jaundice without receiving medical treatment." (Doc. No. 2). The Agency stated that Felicity and Joshua "are active clients of the Shelby County Board of Developmental Disabilities, and are eligible for developmental disability services due to their various medical conditions." (Id.). The complaint further mentioned that Felicity had been diagnosed as a "lower-functioning individual" and that she reportedly "functions at the level of a person that is approximately eight years old."

(Id.). The Agency indicated that it was attempting to obtain similar records regarding Joshua.

**{¶4}** As the basis for the complaint, the Agency alleged that "the parents' faults, habits, condition, and lack of adequate parental care have contributed to an environment that has caused harm to the subject child." (Id.). The Agency further detailed that "[t]hese circumstances include, but are not limited to, in (sic) infant bottles not being sanitized and cleaned properly, periods of overfeeding the child mixed with periods of severe underfeeding, and other conditions affecting the home." (Id.). The Agency later filed an amended affidavit which alleged that that Felicity and Joshua were "frequently putting the infant in bed with them while they fall asleep, creating a risk of suffocation." (Doc. No. 23).

**{¶5}** On February 24, 2015, the Agency filed a case plan regarding D.R. and the trial court appointed a Court Appointed Special Advocate ("CASA") to the case.

**{¶6}** On March 10, 2015, the trial court held an adjudicatory hearing on the complaint, where testimony was presented. The trial court found by clear and convincing evidence D.R. to be a dependent child and adjudicated him the same, but found a lack of clear and convincing evidence to find D.R. to be a neglected child.

**{¶7}** On April 2, 2015, the CASA filed her report with the trial court, recommending that D.R. remain in the custody of Felicity and Joshua with the Agency having protective supervision.

**{¶8}** On April 29, 2015, the trial court issued a dispositional order approving the Agency's case plan and ordering that D.R. remain in Felicity and Joshua's custody subject to court-ordered protective supervision. Pursuant to the case plan, the Agency facilitated in-home coaching/parental education, transportation assistance, and childcare services. Felicity and Joshua also submitted to psychological evaluations.

**{¶9}** On July 17, 2015, the Agency filed an *ex parte* motion for emergency custody of D.R. As the basis for the motion, the Agency alleged that "D.R. cannot be safely maintained in the family home." (Doc. No. 49). The Agency recited Felicity's and Josh's inability to follow the pediatrician's instructions to treat D.R.'s respiratory issues by failing to administer the prescribed amount of medicine, and by failing to maintain appropriate cleanliness and hygiene standards. The Agency also cited a concern with the lack of improvement in the parents' ability to consistently and safely provide for D.R. on a daily basis, despite the intense level of services being provided to them, which the Agency contended posed an immediate danger to D.R. The trial court subsequently granted the Agency's *ex parte* motion for temporary custody of D.R.

{¶10} The Agency also filed an amended case plan with the trial court, which contemplated that D.R. remain in its temporary custody with Felicity and Joshua having supervised visitations. The objectives of the case plan were focused upon the ultimate goal of reunification.

{¶11} On July 21, 2015, the trial court held a shelter care hearing, where testimony was presented in support of the Agency's motion for temporary custody. In its July 29, 2015 Judgment Entry the trial court found reasonable grounds "that the child is in immediate danger from the child's surroundings, and removal was necessary to prevent the child's physical or emotional harm." (Doc. No. 59 at 3). The trial court further found that "reasonable efforts to prevent the removal of the subject child from the home have been made, however due to the parents' inability to properly care for the child and administer the child's medication, it is in the child's best interest to remain in the custody of the [Agency]". (Id.). The trial court approved and adopted the amended case plan, and ordered D.R. to remain in the temporary custody of the Agency.

{¶12} On October 8, 2015, the trial court conducted a review hearing, where testimony was presented indicating that Felicity and Joshua were showing signs of progress in consistently maintaining a clean home. D.R.'s health had also improved since his removal from the home. The evidence indicated that D.R.'s respiratory problems while in his parents' care were likely caused by overfeeding and D.R.

aspirating into his lungs. The trial court determined that it was in D.R.'s best interest to continue the Agency's temporary custody of D.R., with Felicity and Joshua having supervised visitation with D.R. at their home.

{¶13} On June 15, 2016, the Agency filed a motion to approve an amended case plan. The Agency requested that Felicity and Joshua undergo another psychological evaluation to receive "additional input, recommendations, and measures of progress since the initial evaluation." (Doc. No. 67). The Agency stated that it "continues to seek additional supports that can make a difference as it pertains to reunification planning." (Id.). The trial court subsequently approved the amended case plan.

{¶14} On July 22, 2016, the Agency filed an amended case plan to include a second child, Da. R., who was born to Felicity and Joshua in July of 2016.

{¶15} On August 3, 2016, the trial court issued a judgment entry indicating that a review hearing was held, where testimony was presented establishing that the conditions in Felicity and Joshua's home had deteriorated and the parents had failed to make any further progress, despite all the services they had received. At the hearing, an agreement was reached between the parties that Felicity and Joshua would submit to an updated psychological evaluation.

{¶16} On February 16, 2017, the Agency filed a motion for permanent custody of D.R.[1] In support of its motion, the Agency stated that D.R. had been in its temporary custody for twelve or more months of a consecutive twenty-two month period and cannot be safely placed with either parent within a reasonable period of time. The Agency argued that "[o]ver two years of involvement and following a vast array of services and activities, the parental progress has been insufficient with reunification not realized or recommended now or at any point in the foreseeable future. Due to the parents' limitations in combination with a high level of resistance, the level of risk to D.R. remains extremely high." (Doc. No. 134 at 2).

{¶17} On May 19, 2017, the trial court commenced an evidentiary hearing on the Agency's motion for permanent custody of D.R., which continued over the course of seven days in the subsequent five months. The Agency presented lengthy testimony from several service providers who assisted Felicity and Josh over the course of the two and a half years of the Agency's involvement. The CASA's reports were submitted by stipulation for the trial court to review, in lieu of her testimony being presented at the hearing. Felicity testified on her own behalf and also presented the testimony of one of her longtime service providers, who was contracted to work with her through the Shelby County Board of Developmental Disabilities. Joshua did not testify or present any witnesses on his own behalf.

---

[1] We note that the Agency originally filed a motion for permanent custody of D.R. on November 1, 2016, which was later withdrawn.

{¶18} On November 6, 2017, the trial court issued a judgment entry granting the Agency's motion for permanent custody of D.R. The trial court found by clear and convincing evidence that the Agency satisfied its burden of establishing that D.R. could not be placed with either parent in a reasonable amount of time under R.C. 2151.414(E)(1) and (2). Specifically, the trial court determined in its judgment entry that:

> **Based upon the evidence adduced at hearing the Court finds, by clear and convincing evidence, that notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, each parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In making this determination, the Court has considered the parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing the parent's conduct to allow him or her to resume and maintain parental duties. In addition to the cognitive limitations of each parent, the Court also finds, by clear and convincing evidence, that each parent's unwillingness or resistance to meeting the case plan objectives has significantly contributed to this failing. The Court further finds, by clear and convincing evidence, that the child cannot be returned to either parent within a reasonable period of time and should not be placed with either parent.**
>
> **Based upon the evidence adduced at hearing the Court further finds, by clear and convincing evidence, that the chronic mental retardation of each parent is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time or within one year.**

(Doc. No. 243 at 10). The trial court continued its analysis by considering the best interest factors contained in R.C. 2151.414(D)(1) and concluded that granting the Agency's motion for permanent custody is in D.R.'s best interest. In particular, the trial court found that:

> **D.R. has been in the care of [the Agency] most of his young life. He is in need of long term stability and the Court finds it would be detrimental to D.R. to allow this situation to continue or to return him to his parents. There is simply no indication that further case plan efforts with the parents would be beneficial to D.R. His placement in foster care has seen an enormously positive effect on his health and overall well-being.**

(Id. at 11). Accordingly, the trial court issued an order granting the Agency's motion for permanent custody of D.R. and terminating Felicity's and Joshua's parental rights.

{¶19} Felicity and Josh each filed separate notices of appeal, asserting the following assignments of error.

### FELICITY'S ASSIGNMENT OF ERROR NO. 1

**SHELBY COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES-CHILD SERVICES DIVISION FAILED TO PROVIDE REASONABLE CASE PLANNING AND DILIGENT EFFORTS TO ASSIST THE MOTHER TO REMEDY THE CONDITIONS THAT INITIALLY CAUSED THE REMOVAL OF THE MINOR CHILD FROM THE HOME.**

### FELICITY'S ASSIGNMENT OF ERROR NO. 2

**SHELBY COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES-CHILD SERVICES DIVISION FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE**

**PERMANENT PARENTAL RIGHTS OF THE MOTHER SHOULD HAVE BEEN TERMINATED.**

**FELICITY ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT VIOLATED MOTHER'S U.S. CONSTITUTIONAL FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW.**

**JOSHUA'S ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE EVIDENCE DID NOT SUPPORT A FINDING THAT TERMINATION OF PARENTAL RIGHTS OF MOTHER AND FATHER WAS IN THE CHILD'S BEST INTEREST.**

**JOSHUA'S ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE EVIDENCE DID NOT SUPPORT FINDING THAT CHILDREN'S SERVICES MADE REASONABLE EFFORTS TO PREVENT THE REMOVAL OF THE CHILD OR EFFECT REUNIFICATION.**

**{¶20}** We elect to discuss Felicity's and Joshua's assignments of error together due to the fact that the issues raised therein are interrelated.

**{¶21}** On appeal, Felicity and Joshua contend that Agency failed to use reasonable efforts to reunify the family. Specifically, the parents argue that the Agency failed to devise a case plan that adequately accommodated their developmental disabilities and failed to use diligent efforts to assist them in learning how to meet D.R.'s medical needs. Felicity and Joshua further argue that the trial

court's decision to grant the Agency's motion for permanent custody of D.R. was against the manifest weight of the evidence.

{¶22} Before we address the assignments of error, it is necessary to discuss the evidence presented at the seven-day permanent custody hearing.

*Evidence Adduced at Hearing*

1. *Background Regarding the Parents' Disabilities*

{¶23} The Agency presented several witnesses at the multiple day hearing on its motion for permanent custody of D.R. Two of these witnesses were Julie Maurer and Kristopher Anderson, who were Felicity's and Joshua's Service and Support Administrators ("SSA") with the Shelby County Board of Developmental Disabilities ("SCBDD"). Testimony at the hearing indicated that both Felicity and Joshua had intellectual disabilities which impaired their cognitive abilities. Specifically, the record established that Felicity had a full scale IQ of 75 and suffered from fetal alcohol syndrome, and Josh had a full scale IQ of 65. The services that Felicity and Joshua received through the SCBDD were voluntary and could be terminated at any time if they no longer wanted to receive them.

{¶24} Ms. Maurer testified that she had worked with Felicity for over fourteen years and provided oversight of the services Felicity received, which helped Felicity meet her basic needs. Ms. Maurer explained that despite Felicity's disability, which affects her memory and ability to reason, Felicity was employed

at We Can Too in St. Marys.[2]  Mr. Anderson testified that he had been Joshua's SSA for seven years and also helped coordinate the services Joshua received from the SCBDD as a result of his disability.  He stated that Joshua was employed at NKP in Sidney.  Both Felicity's and Joshua's Individual Service Plans ("ISP") were admitted as exhibits at the hearing.  Felicity and Joshua maintained their own apartment where they lived together.

{¶25} The testimony from the SSAs indicated that in addition to their wages, Felicity and Josh also received Social Security disability benefits.  According to the SSAs, Felicity and Joshua had trouble managing their finances therefore the SCBDD contracted with Robert E. Miller ("REM") to be their payee.  As their payee, REM paid Felicity's and Joshua's bills and took them grocery shopping.  In addition, REM provided them transportation to doctor's appointments and assistance with household chores.[3]  REM also instituted giving Felicity and Joshua weekly spending money because they had mismanaged their finances in the past.

{¶26} According to the testimony at hearing, Felicity was nearly six months pregnant with D.R. before her service providers were aware of the pregnancy.  REM assisted Felicity in getting to doctor's appointments and helped the couple obtain

---

[2] Testimony subsequent to Ms. Maurer's indicated that Felicity also worked a "community job" at Kroger, which she apparently started during the course of the several day hearing on the motion for permanent custody.

[3] At the time of the hearing, Felicity did not have a driver's license and Josh had a license but did not have a vehicle.

the essentials for having a newborn in the home. When Felicity gave birth to D.R. in early December of 2014, REM provided 24/7 in-home care to the couple for two weeks after D.R. was born. After that point, REM's assistance was reduced to five to seven hours a week because the intensive level of care could not be financially sustained.[4]

{¶27} Dr. Sarah Marshall was on call when D.R. was born and testified that D.R. had jaundice and needed close inpatient and outpatient monitoring. She became concerned when Felicity and Josh failed to bring D.R. to a follow up appointment. Even though the jaundice eventually resolved, D.R. developed breathing problems, which required breathing treatments and medication. Dr. Marshall observed that Felicity and Joshua appeared to fundamentally lack an understanding of D.R.'s medical conditions and had trouble keeping track of his medications. She testified that Felicity's and Joshua's level of confusion was more troublesome that the average parent. Dr. Marshall prepared flow charts to assist with their comprehension, however, Felicity and Joshua were still not able to relay to her a reliable history of the medication they gave to D.R. and were also unable to tell her the last time he ate and how much.

---

[4] It should be noted that REM's role was to provide support to Felicity and Joshua individually, based on the contract REM had with the SCBDD, and Felicity's and Joshua's qualifications for the services. REM's role was not to provide services or support directly to D.R because D.R. did not individually qualify for services from the SCBDD.

*2. Agency's Involvement: Protective Supervision*

**{¶28}** According to the ongoing caseworker, Barb Reindel, the Agency first became involved shortly after D.R.'s birth based upon the concerns expressed by Dr. Marshall and other service providers that Felicity and Joshua were not properly feeding D.R. and that the home conditions were unsanitary. Caseworker Reindel was assigned to the case on January 27, 2015.

**{¶29}** Caseworker Reindel testified that the Agency began providing services to assist Felicity and Joshua with learning how to independently parent D.R. in February of 2015 after they filed a complaint alleging D.R. to be a dependent and neglected child. The Agency created a case plan and provided services with the goal of supporting Felicity and Joshua so that they could continue to have D.R. in their home. These services included placing D.R. in a full-time accredited daycare, providing parenting coaches who assisted Felicity and Joshua with D.R. in the home, and arranging transportation to and from daycare for D.R., Felicity, and Joshua. Caseworker Reindel noted that Felicity and Joshua had continuous in-home support with D.R. during the waking hours of the day. The Agency also contacted the Shelby County Department of Health who assigned someone to the case to teach Felicity and Joshua about nutrition and assist with D.R.'s feedings.

**{¶30}** The Agency coordinated monthly Primary Care Team ("PCT") meetings, which, according to Caseworker Reindel, consisted of ten to twelve

people including Felicity and Joshua. The individuals who attended the PCT meetings were Caseworker Reindel and other service providers who met to discuss the case. For example, both Felicity's and Joshua's SSAs from the SCBDD were in attendance to assist the team, provide insight into the parents' individual disabilities, and to advocate for the parents.

{¶31} The testimony at the permanent custody hearing indicated that despite the number of services and the amount of support provided to them, Felicity and Joshua still struggled to recognize basic health and medical risks that could injure D.R. For example, one of the four in-home parenting coaches involved in the case, Janice Geise, testified that preparing sanitary bottles to feed D.R. continued to be an issue from the time she first starting assisting Felicity and Joshua in December of 2014. Coach Geise recalled that Felicity and Joshua consistently failed to sterilize the bottle components, which contributed to the nipples and the bottles growing mold and mildew. She also testified to witnessing Felicity preparing a bottle for D.R. with a gnat floating inside and intervening before Felicity could give it to D.R. When D.R. moved to eating baby food, Coach Geise observed both parents fail to put enough formula in the cereal to thin it out, despite advising them numerous times that thick cereal presented a choking hazard. She also recalled times where Josh "rushed" D.R.'s feeding, also presenting a choking hazard, and one occasion when she had arrived to the home around lunchtime and Felicity had

forgotten to feed D.R. breakfast despite the feeding schedule being posted in the home.

{¶32} Coach Giese also recalled that she found food in the refrigerator which had expired years earlier, and she consistently observed trash and small objects able to choke D.R. littered on the floor of the home. She explained that Felicity and Joshua were not permitted to bathe D.R. without a coach or other service providers present because they would forget to wash body parts, not know how much water to put into the bath, and generally fail to ensure that the bath was given safely.

{¶33} In addition to the poor hygiene issues, the record indicates that a major concern arose with Felicity's and Joshua's inability to administer medications to D.R. properly. Coach Geise recalled that early on Felicity and Joshua struggled with the multi-step progress of measuring appropriate dosages of over-the-counter medications like Tylenol and Benadryl. She had Felicity and Joshua practice measuring the correct dosage by placing water in the syringe, but noted there was little improvement over time.

{¶34} The safety risk to D.R. increased when Felicity and Joshua continued to fail to follow Dr. Marshall's instructions for administering D.R.'s breathing treatments, which initially consisted of dispensing Buterol, then later Albuterol, through a nebulizer mask every four hours. Coach Giese testified that Felicity and Joshua failed to administer the medication at night when the home coaches were not

there. She also recited an incident where the parents had administered expired medication to D.R. before she arrived at the home. She further described times where Felicity did not administer the full dosage to D.R. as prescribed, and had to be prompted to continue the treatment until the dose was completely gone.

{¶35} D.R.'s respiratory problems continued to worsen to the point where D.R. began to wheeze. Coach Geise stated that Felicity and Josh failed to recognize the severity of the situation and had to be prompted to take D.R. to the pediatrician. She also recalled an incident in April of 2015 when D.R. had pink eye so severe that his eye had swollen shut. When Coach Geise learned that Felicity had no intention to seek medical attention, she prompted the parents to take D.R. to the Emergency Room for treatment. Eventually, Dr. Marshall prescribed Pulmicort for D.R.'s respiratory condition. The Agency mandated that Coach Geise administer the medication because an incorrect dosage posed a serious danger to D.R. Coach Geise testified that despite having fifteen hours a week of assistance between her and another in-home parenting coach assigned to the case, and countless charts and other visual materials, the parents did not improve in recognizing and adequately addressing the health and medical risks posed to D.R. while in their care.

{¶36} Diane Aufderhaar, head teacher and administrator at the Kids Learning Place where D.R. attended daycare, offered a similar narrative of the parents' inability to maintain sanitary conditions in the home and a lack of

comprehension to appropriately address D.R.'s serious health issues. Ms. Aufderhaar recalled that Joshua usually brought D.R. to the daycare center in the morning. Joshua was responsible for bringing in the charts which he and Felicity used to track D.R.'s feedings. He also brought in the nebulizer for D.R.'s breathing treatments and the medication. Ms. Aufderhaar described Joshua as a "very quiet person" and who did not make eye contact or initiate conversations with her. (July 26, 2017 Tr. at 32).

**{¶37}** Ms. Aufderhaar stated that in general she had trouble communicating with both parents. She testified that the charts brought in by Joshua were not always accurate or complete. For instance, the chart would indicate that D.R. had just been fed, but D.R.'s behavior indicated otherwise. She recalled a specific incident after Felicity had picked up D.R. from daycare and was waiting for a ride. Despite the fact that D.R. had just been fed by the staff, Felicity was attempting to feed him another bottle in the lobby. In addition to the overfeeding about to take place, Ms. Aufderhaar noticed that Felicity was not holding D.R. in a safe feeding position for a young infant which posed a choking hazard. She and other staff members addressed these issues and others with Felicity and Joshua several times, however, no improvement was made.

**{¶38}** Ms. Aufderhaar also expressed concerns with Felicity's and Joshua's inability to recognize and comprehend risks posed to D.R.'s health. She explained

that the nebulizer was not properly cleaned when it was brought from the home. She described D.R.'s breathing while living with the parents as "raspy" and "labored." (July 26, 2017 Tr. at 38). She recalled that in May of 2015 D.R. had "very loose stools" for almost a six-week period and when she spoke to Felicity about it, Felicity became defensive and assured her that she had called pediatrician and "everything was ok." (Id. at 53-54). Ms. Aufderhaar further testified that she submitted monthly reports to the Agency and attended the PCT meetings.

{¶39} Ms. Aufderhaar recalled that D.R. began attending the daycare center in February of 2015 and was receiving breathing treatments at the time. Ms. Aufderhaar explained that in order for the staff to give D.R. the treatments, the medication must be in the original packaging with the prescription label attached. She described an incident in July 2015 where Felicity brought vials of Albuterol to the center in a plastic bag with a prescription label that had been altered with the original date crossed out and the current date handwritten over the sticker. As a result of the lack of compliance with the center's safety protocols, the medication could not be administered to D.R. Ms. Aufderhaar also recounted an incident on July 13, 2015, during which Felicity was giving D.R. the breathing treatment at the center. According to Ms. Aufderhaar, approximately halfway through the treatment, Felicity stopped the treatment, asked infant D.R. if he had "enough," and poured the remaining dosage down the drain. (July 26, 2017 Tr. at 24).

*3. Agency's Removal of D.R.*

**{¶40}** On July 17, 2015, D.R. was removed from Felicity and Joshua's home on an emergency basis. Caseworker Reindel testified that the Agency sought emergency removal of D.R. from the home due to the "primary high-risk issue" which was "[D.R.'s] unmet medical needs." (Oct. 18, 2017 Tr. at 38). The decision to seek emergency removal came immediately after it was reported to the Agency that Felicity had failed to administer the complete dosage of medication to D.R. in front of the daycare staff and that Felicity had altered the prescription date on the label.

**{¶41}** These events were the culmination of a series of ongoing episodes that demonstrated Felicity's and Joshua's lack of understanding of the serious nature of D.R.'s health conditions, and the risk posed if they failed to follow the medical directives given to them. According to Caseworker Reindel, D.R.'s respiratory condition had worsened to the point where he was prescribed breathing treatments every four hours. Despite the intense level of intervention by service providers, Felicity and Joshua failed to recognized or appreciate the critical nature of D.R.'s illness and consequently continually failed to give the breathing treatments as prescribed which inevitability prolonged the severity of his medical condition.

**{¶42}** Additionally, Felicity and Joshua failed to make progress in maintaining a sanitary home while D.R. was in their custody. Caseworker Reindel further noted

that the parents had a difficult time making adjustments to D.R.'s developmental needs as he grew and struggled to independently handle the unpredictable situations that arose out of caring for an infant child. Often times the parents would have to be prompted by service providers to make necessary appointments to monitor and/or address medical or safety issues. Caseworker Reindel testified that the service providers, including D.R.'s pediatrician, recognized that something needed to be done and supported the decision to remove D.R. from the home.

*4. Agency's Temporary Custody of D.R.*

    *A.   Visitations*

{¶43} Initially Felicity and Joshua had supervised visitations with D.R. at the Agency in July of 2015. According to Caseworker Reindel, visitations were moved to the parents' home in September of 2015 to "provide real life opportunities in the home setting" where they continued until September of 2016. (Oct. 18, 2017 Tr. at 112). She further explained the parents were granted unsupervised visitations of D.R. in May of 2016 because the Agency "wanted to give [the parents] an opportunity" to demonstrate their parenting skills of D.R. (Id. at 113). However, the unsupervised visitations were terminated on June 8, 2016 because the parents failed to follow certain safety guidelines put in place by the Agency.

{¶44} Caseworker Reindel elaborated that one issue Felicity and Joshua had trouble with in the past was failing to recognize when people were taking advantage

of them or posed a danger to them. One such person was Joshua's brother who reportedly not only took advantage of their finances, but also is a registered sex offender. As a result, the case plan included a provision that only people who were approved by the Agency were permitted into their home. Despite this directive, Felicity and Josh had made arrangements for unapproved people to visit their home while they had D.R. The parents were also not permitted to bathe D.R. without a service provider present as a safety precaution. The parents were not compliant with this directive.

**{¶45}** The visitations reverted to being supervised at the parents' home. However, after an incident at the home in September of 2016 where Joshua reportedly became aggressive with D.R. and the in-home coach, the supervised visitations were moved to the Agency.

**{¶46}** In April of 2017, visitations were suspended because the Agency had received reports from multiple service providers, including the home coaches, foster parents, and D.R.'s daycare teachers, that D.R. had become increasingly aggressive and agitated immediately after visitations with the parents. D.R. also had trouble eating and had been diagnosed with "failure to thrive" due to his weight loss.[5] D.R.'s emotional state began to improve and he also began to gain weight after

---

[5] Dr. Marshall, D.R.'s pediatrician, explained that a failure to thrive diagnosis "means that his growth is not appropriate and that there's concern that his growth is so poor, it will start to affect his permanent growth and development. A lot of times kids get skinny in a way that they'll catch up eventually but once it gets to a certain degree, we worry that it will have more permanent repercussions." (May 19, 2018 Tr. at 24).

seeing a specialist and being placed on a regimented feeding schedule. Shortly thereafter, supervised visitations at the Agency were reinstated. However, D.R.'s behavior appeared to immediately regress and visitations were again suspended indefinitely on May 4, 2017 out of concern for D.R. emotional health.

### B. D.R. in Foster Care

{¶47} Upon the trial court granting temporary custody of D.R. to the Agency in July of 2015, D.R. was placed in foster care with Ginger Nanik and her husband. Ms. Nanik testified that when D.R. first came to live with her he was seven months old and need breathing treatments every four hours. She recalled setting an alarm in the middle of night to give D.R. his breathing treatment and to monitor him. Ms. Nanik began to notice improvement in D.R.'s breathing within three to four days of administering the medications as prescribed. She stated that when she took D.R. to see the pediatrician two weeks later, D.R.'s breathing had improved to the point where he only needed the treatments on an "as needed emergency basis." (July 26, 2017 Tr. at 127).

{¶48} However, D.R. developed more medical issues as he became older. Ms. Nanik stated that D.R. had a number of ear infections which eventually led to him having surgery to place tubes in his ears, requiring around the clock post-surgery care. She noticed that D.R. began to exhibit aggression issues around the age of one-year-old. D.R. was also placed in intensive speech therapy. Ms. Nanik

described D.R. as a challenging child both medically and behaviorally. She attended the monthly PCT meetings and interacted with Felicity and Joshua multiple times a week during their visitations.

{¶49} When she picked D.R. up from visitations she noticed that Felicity and Joshua were unable to relay a consistent history of feeding times, diaper changes, and medications given. Felicity and Joshua also missed important observations during the visitations. Many times the home coach would prompt the parents to give essential information that occurred during the visitations or help the parents answer her questions or provide clarifications.

{¶50} Ms. Nanik addressed D.R.'s failure to thrive diagnosis. Early in 2017, she noticed that D.R.'s emotional distress tended to be triggered by visitation with Felicity and Joshua. D.R.'s teachers at daycare had noticed a similar pattern because many of the visitations occurred during the hours when D.R. was in their care. Ms. Nanik explained that she had concerns with D.R. developing chronic diarrhea and an aversion to eating. She reflected upon the suspension of visitations and stated that D.R.'s demeanor had improved immediately, "there was a noticeable change, less aggression, um less tantrums, more cooperative." (July 26, 2017 Tr. at 186). After the suspension of visitations, D.R.'s weight also began to satisfactorily increase to the point where the specialist determined he could return to being monitored by his pediatrician.

### C. Agency Case Planning Efforts

{¶51} After D.R. was placed in foster care, the Agency devised a case plan with the objective of assisting Felicity and Joshua in developing the necessary skills to be reunified with D.R. in their home. Specifically, the case plan focused on teaching the parents about (1) feeding and nutrition; (2) basic child care, including safety issues; (3) sanitary handling of food and appropriate storage; (4) understanding time and information management; (5) child development, including implementing age appropriate discipline; (6) maintaining a clean and safe home; and (7) meeting D.R.'s medical needs. In order to help the parents meet these objectives, the Agency continued to have monthly PCT meetings and to provide the parents with two home coaches who alternated days in the home to give the parents different approaches to strategies to improve upon these skills.

### 1. Feeding and Nutrition

{¶52} Coach Geise and the other primary home coach, Nikki Oren, worked together to teach the parents about meal planning and proper nutrition. Coach Oren testified that she made lists of the food groups and helped the parents select one from each category to prepare the meal. The coaches also assisted in making the parents' grocery lists. However, the parents failed to follow through with the meal planning and ensuring that D.R. was receiving proper nutrition. With regard to feeding, the parents persistently failed to recognize potential choking hazards when

D.R. started eating solid foods. Coach Oren recalled instances where D.R. had burned his tongue on food because the parents failed to check the temperature before serving it to him and other instances where the parents did not cut food into small enough pieces to prevent D.R. from choking, despite repeated instruction on safety practices. Similarly, Coach Geise recalled a visitation in the home in the Summer of 2016 during which D.R. choked on a chip. According to Coach Geise, Felicity and Joshua failed to act and relied on Coach Geise to remove the chip from D.R.'s mouth. All of these things had been addressed with the parents multiple times by the coaches with little or no progress made.

### 2. *Basic Child Care*

{¶53} The testimony at the permanent custody hearing also indicated that Felicity and Josh failed to improve upon their ability to recognize safety issues and provide the appropriate level of intervention and supervision of D.R. during visitations. Several examples of the parents' continued failure to recognize safety concerns were recited at the permanent custody hearing. For instance, Coach Geise explained that even a year after D.R.'s removal, Felicity and Joshua were still not permitted to bathe D.R. alone because of their failures to take certain safety precautions. She recalled one day in June of 2016 assisting the parents with giving D.R. a bath. According to Coach Geise, as they approached to the bathtub to start the bath, excrement was found in the bathtub. Felicity informed Coach Geise that

Joshua had defecated in the bathtub. The parents attempted to place D.R. in the bathtub before Coach Geise intervened and directed them to clean up the excrement. Coach Geise observed Felicity clean the excrement with a washcloth and then attempt to use the same washcloth to bathe D.R. Again, Coach Geise intervened before the soiled washcloth was used on D.R.

{¶54} Coach Oren relayed another incident during a visitation where D.R. was standing on a picnic table. The parents were not paying attention when D.R. fell and began to cry. She recalled that neither Felicity nor Joshua went to D.R., but waited for her to intervene and prompt them. She recalled another visitation at the Agency during which D.R. unlocked the door, left the visitation room, and shut the door. Instead of trying to prevent him from leaving, Felicity began laughing at the situation. Coach Geise was the one who retrieved D.R. and brought him back into the room.

{¶55} Another such episode observed by Coach Oren occurred during a visitation in February of 2016 when Joshua gave two-year-old D.R. a large marble to play with and D.R. immediately put it into his mouth. Felicity took the marble out of D.R.'s mouth but then gave it back to D.R. who again tried to put it in his mouth. During another visitation in July of 2016, Coach Oren noticed D.R. playing with a paint chip on the wall and eventually putting the paint chip in his mouth. She alerted the parents to the problem and prompted them to pull the paint chip out of

D.R.'s mouth. Coach Oren explained that her role as a coach was to teach them the skills and then observe them parent D.R. during the visitations. However, she consistently found herself intervening during visitations for D.R.'s safety.

### 3. Sanitary Handling of Food and Appropriate Storage

{¶56} Despite the efforts of the home coaches in the beginning of the case to remediate the issue of the unsanitary bottles, the evidence at the permanent custody hearing indicated that the parents failed grasp the basic concept that unsanitary food preparation and conditions posed a health risk to D.R. Both coaches testified that the parents continued to have problems with keeping the kitchen clean and oftentimes there were dirty dishes piled in the sink with stagnant water. This resulted in many of the food storage items containing mold and old food, which posed a health hazard to D.R. even after he was removed from the home. In early 2017, Felicity and Joshua brought food and beverages in containers and sippy cups from their home for D.R. to consume during the supervised visitations at the Agency. D.R. developed diarrhea and refused to eat after the visitations. Eventually, a correlation was discovered between food brought in by the parents and D.R.'s symptoms subsided after the parents were not permitted to bring food to the visitations. Caseworker Reindel explained that when the issue was addressed with the parents, they failed to see the connection and simply did not understand why they could not bring food to D.R. anymore.

{¶57} The parents also had problems disposing of expired, moldy food in the refrigerator and keeping food properly stored. Coach Oren testified that when she was first assigned to the case in November of 2015, she observed a large amount of mouse feces in the home, including on the kitchen stove. The parents moved homes to escape the mice infestation, only the have the same problem in the subsequent home. Coach Oren recalled a specific incident where she witnessed a mouse scurry back and forth across the parents' kitchen in September of 2016.

*4.    Understanding Time and Information Management*

{¶58} Caseworker Reindel testified that planning in advance and following a varying schedule to meet D.R.'s needs continued to be a seemingly insurmountable obstacle for the parents. She cited the specific example of the parents' persistent failure to arrange for transportation to take D.R. to medical and/or therapy appointments which were made well in advance. She also recalled instances in January of 2016, when the parents were given more autonomy to demonstrate their parenting skills, where they failed to follow through in making appointments with D.R.'s medical providers and specialists. Caseworker Reindel explained that Felicity maintained a "blue binder" that was supposed to help her keep track of appointments, schedule follow-ups, and arrange transportation, however, this organizational tool proved not to be effective for the parents. She recalled that the parents had difficulty adjusting to differing appointment times. For

instance, if an appointment and/or visitation had in the past been from 9:30 a.m. to 10:30 a.m. and was changed to 11:00 a.m. for scheduling purposes, the parents would typically miss the appointment because they were unable to make the adjustment.

{¶59} Caseworker Reindel also testified that the parents had difficulty telling time and/or assessing the passage of time. She provided an example demonstrating the parents' inability to understand that "at 9:30 on the clock or on your watch, is the end of your visit. There's been times as recent as February of 2017, that Felicity was packing up and getting ready to leave fifty minutes early. There were repeated incidents of Josh preparing [D.R.] and this is in 2017, prior to the suspension, where he would prepare [D.R.] and take him out ten, fifteen minutes early, not exercising that full amount of time." (Oct. 18, 2017 Tr. at 86).

{¶60} Caseworker Reindel explained that the Agency and other service providers constantly reassessed the approaches they used for time management and scheduling to help the parents better understand. She personally wrote down appointment times on their calendars, and as recently as August and September of 2017, during the timeframe of the ongoing permanent custody hearing, sat down with the parents to devise a new tracking system more comprehensible to them and prompted them to put appointments in their phones.

*5.  Child Development, Including Implementing Age Appropriate Discipline*

{¶61} Both home coaches and Caseworker Reindel testified to the parents' inability to recognize basic developmental milestones reached by D.R. and to adjust to age appropriate parenting of him.  As previously mentioned, D.R. exhibited challenging behaviors for any caretaker to manage.  Caseworker Reindel explained that she and the coaches consistently tried to correct Felicity's propensity to laugh at or negatively reinforce D.R.'s aggressive behaviors during visitations.  Coach Oren testified that D.R. was prone to throwing tantrums during visitations and neither parent implemented the discipline strategies that she had worked on with them numerous times.  Rather, the parents laughed and surmised that D.R. was simply in a bad mood.  Moreover, neither parent attempted to redirect D.R when he was playing with the microwave or standing on toys and other equipment during visitations at the Agency.

{¶62} Both Coach Geise and Caseworker Reindel recalled an incident in September of 2016 when the parents were exercising visitation with D.R. and infant Da.R. at their home.  During the visit, Felicity was changing Da.R.'s diaper on the floor.  D.R. tripped and bumped in to Da.R. which made Da.R. cry.  According to Coach Geise, Joshua, who was not in the room at the time, "flew down the stairs very angry [and] went to grab [D.R.] by the arm."  (Oct. 18, 2017 Tr. at 255).  Coach

Geise intervened and explaining that such an aggressive reaction was inappropriate for an accident. Felicity did not intervene, stating she was busy with the other child. Coach Geise recalled Joshua becoming aggressive and yelling at her. She took D.R. outside to meet the foster parents because the visit was almost over. Joshua refused to go outside to say good-bye to D.R. Felicity reportedly supported Joshua's behavior, maintaining he was simply trying to discipline D.R.

*6. Maintaining a Clean and Safe Home*

**{¶63}** Coach Geise, who was involved in the case for the duration of the Agency's involvement, testified that after the removal of D.R. the parents continuously failed to develop the skills to recognize the health risks posed by their unsanitary habits. Coach Oren also testified to observing a large amount of mouse feces, including on the kitchen stove, and dust clinging to the walls in the parents' home. She recalled that the bathrooms were not being cleaned and the floor had not been vacuumed. She brought in a vacuum from her home for the parents to use.

**{¶64}** Caseworker Reindel further testified that the parents lived in four different homes during the course of the Agency's involvement and the parents had the same issue with uncleanliness in each home. She visited the parents during the summer of 2017, while the permanent custody proceedings were being held, and recalled the filth in the bathrooms of the parents' home. She noticed that the toilets had not been cleaned. When she addressed this with Felicity and Joshua they

claimed they did not know that they needed to routinely clean the toilet, and that they had not cleaned it since they first moved in five months ago. There was also a clogged sink in the home that the parents failed to take steps to repair.

{¶65} Caseworker Reindel further testified that the parents failed to install smoke detectors in the newest residence despite the Agency providing the devices to them. She explained that instances such as the ones described above highlight the parents' inability to take initiative, follow through, and problem solve independently, and presents a concern when it comes to their ability to properly take care of D.R. because the parents will not always have the Agency and the service providers to help guide them if they were to regain custody of D.R.

7. *Meeting D.R.'s Medical Needs*

{¶66} Even though D.R. no longer needed daily breathing treatments after he moved into foster care, Felicity and Joshua continued to demonstrate trouble with understanding how and when to give over-the-counter medication. Coach Oren testified that the parents were persistently confused as to when to use Tylenol or Benadryl. She stated that D.R. had allergies so she "constantly quizzed" the parents to see if they could discern the different uses for the medications, a concept which, according to Coach Oren, they never appeared to grasp. (May 25, 2017 Tr. at 153). She recalled an incident in November of 2015 during which D.R. was receiving Benadryl and the parents had administered a dose during the visitation. Coach Oren

asked the parents before she left what time D.R. would need a second dose. Neither parent could answer without guessing. She attempted to show them the correct time by using their fingers to count the hours between doses.

**{¶67}** Ms. Nanik, D.R.'s foster mother, recalled that Felicity and Josh had difficulty recognizing medical issues and how to handle them. For instance, the parents had trouble discerning the difference between prescription and over-the-counter medication, as well as a failure to independently recognize when medication is needed. She recalled a time in 2016 when D.R. had a cold and she was administering Benadryl to him for his symptoms. She stated that she noted the times she gave D.R. the medicine on the daily sheets, which she provided to the daycare when she dropped him off. These sheets were given to the parents routinely during their visitations so they could see if D.R. had been receiving medication. D.R.'s cold resolved and Ms. Nanik no longer gave him the medication, which was notated on the sheets. Nevertheless, the parents continued to give D.R. Benadryl unnecessarily because it had become routine for them, regardless of the fact that both home coaches had attempted to instill in them the recognition of symptoms and the appropriate use of the medication, and the fact that the daily sheets indicated D.R. was no longer taking Benadryl.

**{¶68}** Ms. Nanik also stated that Felicity and Joshua attended some of D.R.'s appointments with various specialists where a medical history was required to be

relayed to the provider. She explained that she gave Felicity and Joshua the first opportunity to provide that information. Felicity was the one who attempted to provide a medical update. However, she often gave incorrect information to the provider. For example, Felicity claimed a number of times that D.R. had asthma, when he in fact had never been diagnosed with the condition. Ms. Nanik explained that she had to intervene to give the correct information. As for Joshua, she could not recall a time where he volunteered to give a medical history of D.R.

{¶69} Ms. Nanik also noticed a lack of follow through from the parents when they had attended D.R.'s speech therapy sessions for a six to eight-week period. She explained that during this time the parents were permitted to take D.R. to the sessions on their own to give the parents a chance to more independently parent D.R. When she picked up D.R. the parents failed to provide her updates and did not consistently take notes during the speech therapy sessions. She stated that relaying the information from the sessions was important because many of the speech lessons and skills were things that they needed to work on with D.R. at home to facilitate his improvement.

D. *Psychological Evaluation of the Parents*

{¶70} Dr. David Hrinko also testified for the Agency at the permanent custody hearing and was recognized as an expert in the field of psychology, specifically in rendering psychological evaluations in permanent custody cases. Dr.

Hrinko conducted an evaluation of Felicity and Joshua in May of 2015 and again in September of 2016. He explained that the Agency requested the second evaluation to assess whether Felicity's and Joshua's ability to function as independent, safe parents had improved with the intensive amount of support services being provided to them over the past sixteen months.

{¶71} Dr. Hrinko reviewed nearly a thousand pages that the Agency had compiled about the case from numerous sources, including service plans, case notes, and progress reports from service providers. He also requested that Felicity and Joshua sign releases so he could gather additional information from the SCBDD beyond the summaries provided to him by the Agency. In addition, to the voluminous amount of written materials, Dr. Hrinko also interviewed Felicity and Joshua.

{¶72} Dr. Hrinko noted his concern with the parents' inability to identify the tasks that need to be done as it related to D.R. and then initiating those tasks without prompting. He testified that he saw "no evidence of them being able to do that which is essential to the concept of functioning independently as a parent." (Oct. 25, 2018 at 46). He further observed a "pattern" that Felicity and Joshua "function relatively well with supports." (Id. at 54). However, "when you add the additional responsibilities of being parents, their weaknesses become more evident and begin to place their children at risk, requiring additional supports and that when those

additional supports are reduced, then the problems reemerge indicating that their ability to function independently as parents is impaired." (Id.)

**{¶73}** Specifically, with regard to Felicity, Dr. Hrinko testified that she has the skills to complete tasks when prompted, but without prompting, monitoring and assistance, she has difficulty being able to identify problems, identify reactions and implement them independently. He further testified that her cognitive impairments, which he believed to be the basis for her limitations, "make it difficult for her to identify information, so this is not due to depression or some other treatable disorder, that can be resolved in a matter of months, therefore increasing her capabilities." (Oct. 25, 2018 at 46). Rather, he described her cognitive limitations to be "persistent across the lifetime" and noted that her records indicate that despite the amount of services she had received her ability to learn new things and function independently as it related to parenting D.R. had not made any significant improvement. (Id.) Accordingly, he testified that he did not believe that Felicity could acquire the appropriate skills to function as an independent parent to D.R.

**{¶74}** With respect to Joshua, Dr. Hrinko noted from the reports from numerous sources that Joshua failed to take an active role in improving and maintaining the standards in the home and that prompting from the service providers was consistently required. He expressed similar concerns about Joshua being able to independently parent D.R. without service providers in place and to shift his

priorities to learn, develop, and implement skills above and beyond those which are necessary to maintain as a single adult. Dr. Hrinko described Joshua's cognitive limitations as putting "him in a position to have trouble thinking across a broad period of time. He tends to think about the moment from his point of view which makes it difficult for him to understand how his actions impact others, how they may create problems down the road and to be able to identify and anticipate potential problems to act proactively to avoid problems rather than respond or react to them." (Oct. 25, 2018 at 78). Dr. Hrinko also noted that Joshua was candid with him during the interview that "there were things that he could have been doing and should have been doing but wasn't doing." (Id. at 167).

**{¶75}** Dr. Hrinko opined that Joshua's cognitive limitations placed D.R. at risk, despite being provided opportunities for support to develop and improve his skills, which have not proven to be sufficiently effective. He further testified that he did not think Joshua could become capable of functioning as an independent parent to D.R. in a reasonable amount of time.

**{¶76}** With an understanding of the evidence presented at the permanent custody hearing, we now turn to the issues presented on appeal.

*Felicity's First Assignment of Error*
*Joshua's Second Assignment of Error*

**{¶77}** In these assignments for error, Felicity and Joshua maintain that the Agency failed to use reasonable efforts and diligent case planning to accommodate

their intellectual disabilities. The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; *see*, *also*, *In re Brown*, 98 Ohio App.3d 337, 344 (3d Dist.1994). Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001-Ohio-2302, * 3.

{¶78} To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *In re Evans* at * 3. Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id*. "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's'] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶ 10. We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount. *See* R.C. 2151.419(A)(1).

{¶79} In this instance, the evidence in the record clearly disputes Felicity's and Joshua's contentions that the Agency failed to take their developmental

disabilities into account when devising its case planning. In addition to the recitation of the evidence above demonstrating the numerous supports the Agency put into place to initially *keep* D.R. in the home, and efforts of numerous individuals to provide constant assistance to the parents so that they could develop the necessary skills to be able to independently parent D.R. once he was removed, Caseworker Reindel testified at length regarding how this case was handled differently to accommodate the parents' developmental disabilities. For instance, she explained that the Agency constantly modified their approach to the case plan to assist the parents in understanding the objectives and invested a substantial amount of time and services to the case. The Agency worked very closely with the SCBDD so that those professionals could provide additional support and expertise to the Agency and its service providers.

{¶80} Caseworker Reindel further testified that both parents chose not to communicate well with Agency and failed to return phone calls. She attempted to ameliorate communication problems with the parents by reaching out to the parents' service providers at the SCBDD, with whom the parents had an established relationship, but the communication did not improve.

{¶81} Caseworker Reindel also testified to the efforts made by the Agency to find long-term options aside from filing for permanent custody of D.R. Specifically, the Agency examined eleven possible kinship placements, which were

deemed either to be inappropriate or the people in the placements declined involvement. The Agency researched long term in-home services, which permitted the parents to retain custody of D.R. with services providers assisting on a continual basis. However, this option was not only cost prohibitive, but also presented concern based upon the parents' lack of improvement with the current service providers under the Agency involvement. Finally, the Agency worked with Felicity's and Joshua's SSA's through the SCBDD who researched adult foster care options, under which the entire family would be placed into foster care. However, Joshua was not amenable to this option.

{¶82} For their part, the parents rely primarily on the testimony of Sarah Watkins, a program director at REM, the company that acts as Felicity's and Joshua's payee. Ms. Watkins testified on Felicity's behalf and stated that she did not believe the Agency handled the case appropriately given the nature of the parents' developmental disabilities. Even though Ms. Watkins provided a number of critiques regarding the Agency's case planning, she admitted that she only attended six of the thirty-two monthly PCT meetings, and she had stopped attending the PCT meetings in September of 2016. Moreover, she stated that even when she attended those meetings she failed to speak out or provide suggestions to the Agency as to how to better handle the parents' special needs.

**{¶83}** Based on the foregoing evidence, we conclude that the record in this case demonstrates that the Agency used reasonable case planning to assist Felicity and Joshua in achieving the goal of reunification with D.R. Moreover, we find that the parents have failed to substantiate their claims that the Agency did not accommodate their intellectual disabilities during the case planning. Accordingly, we find that the Agency's case planning and efforts were reasonable and diligent under the circumstances of this case. Felicity's first assignment of error and Joshua's second assignment of error are overruled.

*Felicity's Second and Third Assignments of Error*
*Joshua's Second Assignment of Error*

**{¶84}** In these assignments of error, Felicity and Joshua claim that the trial court's decision to grant the Agency's motion for permanent custody was against the manifest weight of the evidence. Felicity also claims that the trial court's decision to terminate her parental rights violated her constitutional right to due process and equal protection under the law. In making this argument, Felicity essentially reiterates her challenge that the trial court's decision to terminate her parental rights was not supported by the evidence presented.

*A.   Summary of Permanent Custody Procedure*

**{¶85}** R.C. 2151.414 contains procedures that protect the interests of parents and children in a permanent custody proceeding. *See In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26 (2014). This section of the Revised Code requires that before

a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of two prongs of the permanent custody test, as required under R.C. 2151.414(B). *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 9 (2004). The outline of this test is provided below.

1. *Permanent Custody Test: First Prong—R.C. 2151.414(B)(1)*

{¶86} The first prong of the test requires a finding by clear and convincing evidence that there exists one of the statutorily-prescribed situations of R.C. 2151.414(B)(1):

> **(a) The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *.**
>
> **(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.**

R.C. 2151.414(B)(1).

*2.	Permanent Custody Test: Second Prong—Best Interest of the Child*

**{¶87}** "If the trial court determines that *any* provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (Emphasis sic.) *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; see R.C. 2151.414(B)(1). The best interest determination is based on an analysis of R.C. 2151.414(D).

**{¶88}** Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors. *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12, 8-13-14, 2014-Ohio-755, ¶ 27. The factors of R.C. 2151.414(D)(1) include:

> **(a)	The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b)	The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c)	The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**{¶89}** R.C. 2151.414(D)(1). Under this test, the trial court considers the totality of the circumstances when making its best interest determination and no single factor is given greater weight than others by the statute. *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56 (2006); *In re Z.Y.*, 8th Dist. Cuyahoga No. 86293, 2006-Ohio-300, ¶ 13.

*Standard of Review*

**{¶90}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

**{¶91}** In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43.

"Clear and convincing evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, (1986).

**{¶92}** In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). *Accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) (Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.).  "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M., M.M., D.M., B.M.*, 4th Dist. Athens Nos. 12CA43, 12CA44, 2013-Ohio-3588, ¶ 55 (4th Dist.).

**{¶93}** "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. No.2016CA00124, 2016-Ohio-7057, ¶ 20, citing *Miller v. Miller*, 37 Ohio St.3d 71 (1988). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Thompkins* at 387, quoting *Martin* at 175.

**{¶94}** At the outset we note that in its judgment entry granting permanent custody, the trial court found by clear and convincing evidence that D.R. had been in the Agency's temporary custody twelve or more months of a consecutive twenty-two-month period. *See* R.C. 2151.414(B)(1)(d). Alternatively, the trial court also found by clear and convincing evidence that D.R. cannot be placed with either parent within a reasonable time. *See* R.C. 2151.414(B)(1)(a); *see also* R.C. 2151.414(E)(1) and (2). The trial court also considered each enumerated factor in R.C. 2151.414(D)(1) to find by clear and convincing evidence that granting the Agency's motion for permanent custody is in D.R.'s best interest.

**{¶95}** Initially, we note that Joshua maintains that the evidence at the permanent custody hearing pertained predominately to Felicity and was insufficient as to him. Our examination of the record simply does not support this contention.

Rather, the testimony from several witnesses indicates that Joshua chose not to be actively engaged in the case and failed to communicate with the Agency and service providers.

{¶96} Felicity and Joshua also highlight instances in the record where they had demonstrated some improvement in their skills. While infrequent periods of improvement were noted, the record establishes that the overwhelming amount of the evidence indicates that the parents failed to sustain a level of improvement of those skills necessary to eliminate health and safety risks to D.R. on a continual basis without relying the supports put in place by the Agency. Several people working with the parents on this case testified to the genuine love that the parents have for D.R., however, the record confirms the trial court's conclusion that the parents' cognitive limitations impaired their ability to acquire the skills needed to safely and independently parent D.R. within a reasonable period of time. The CASA assigned to the case reiterated the same concerns as many of the Agency's witnesses and stated in her report that:

> **I personally have spent hours searching for avenues of help for Joshua and Felicity that would give them the supervision they require in order to keep [D.R.]. I am confident that there is nothing available for the help they require in order to keep [D.R.] in their care full-time. Although this is very unfortunate for all concerned, Joshua and Felicity, in my opinion, cannot safely take care of [D.R.] without a level of constant supervision. This is apparent due to the abundant resources that have been given to them during this past 26 month period. For all of the resources, there has been little to no consistent improvement in Joshua and**

**Felicity's parenting skills to warrant more time with the parents
to the detriment of [D.R.].**

(Doc. No. 184 at 6). While we have focused on the parents' ability to meet the case plan objectives in order to be reunified with D.R, we cannot discount D.R.'s need for permanency, rather than remaining in continued custodial flux. The record further indicates from various sources that the prolonged case proceedings had begun to take an emotional toll on D.R. The parents had over two years to demonstrate that they could provide D.R. with a safe and legally secure permanent placement, but unfortunately, their efforts fell short.

> **"* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."**

*In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126 (5th Dist.1987).

{¶97} Upon consideration of the totality of the factors, and recalling that the trial court's judgment may rest upon witness demeanor and nuances that do not translate to the written record, we are unable to find that the trial court's determination to grant the Agency's motion for permanent custody of D.R. was against the manifest weight of the evidence. Accordingly, we also find no basis in

the record supporting Felicity's claim that the trial court's decision to terminate her parental rights violated her rights under the Constitution. Therefore, we overrule Joshua's first assignment of error and Felicity's second and third assignments of error.

{¶98} Based on the foregoing, the assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**