[Cite as *In re Dn.R.*, 2020-Ohio-6794.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

                                          CASE NO.  17-20-06

    Dn.R.,

ADJUDGED DEPENDENT CHILD.

[JOSHUA R. - APPELLANT]                  O P I N I O N
[FELICITY B. - APPELLANT]

---

Appeal from Shelby County Common Pleas Court
Juvenile Division
Trial Court No. 2019 DEP 0002

Judgment Affirmed

Date of Decision:  December 21, 2020

---

APPEARANCES:

    *Jeremy M. Tomb* for Appellant, Joshua R.

    *Royce A. Link* for Appellant, Felicity B.

    *Madison S. Brinkman* for Appellee, SCDJFS-CSD

**SHAW, P.J.,**

{¶1} Mother-appellant, Felicity B. ("Mother"), and father-appellant, Joshua R. ("Father"), appeal the March 17, 2020 judgment of the Shelby County Court of Common Pleas, Juvenile Division, granting the motion for permanent custody of their child, Dn.R., filed by Appellee, the Shelby County Department of Job and Family Services—Children Services Division (the "Agency"), and terminating their parental rights. On appeal, Mother and Father argue that the record does not support the trial court's grant of permanent custody of Dn.R. to the Agency.

{¶2} On March 7, 2019, Dn.R. was born to Mother and Father. On the same day, the Agency filed a motion for emergency custody and a complaint alleging Dn.R. to be a dependent child under R.C. 2151.04(C) and (D). In support of its complaint and motion, the Agency attached an affidavit from a caseworker familiar with Mother and Father who averred that the Agency had been granted permanent custody of Mother and Father's two older children, and that the Agency had been involved with Mother and Father since December of 2014. The caseworker stated that both Mother and Father regularly receive support from the Shelby County Board of Developmental Disabilities ("SCBDD"), through which the parents qualify for individual services. The caseworker further averred that the parents have demonstrated an inability to provide for the basic needs of Dn.R.'s two older

siblings, which resulted in their dependency adjudications and the termination of Mother's and Father's parental rights with respect to those children.

{¶3} The trial court granted the Agency's motion for emergency custody specifically finding that Dn.R. "is in danger of illness and/or injury based upon the parents' history of neglect and dependency with respect to prior children and that there is a risk of immediate danger from his surroundings, and parents' ability to provide appropriate care for the child. The court finds that immediate removal is in the child's best interest." (Doc. No. 6). The trial court also appointed a Guardian ad Litem ("GAL") to the case.

{¶4} The trial court subsequently held a shelter care hearing and ordered that Dn.R. be placed in the temporary custody of the Agency.

{¶5} The Agency filed a case plan on April 2, 2019, which provided for several services to assist the parents in learning the basic parenting skills necessary to care for Dn.R.

{¶6} On May 14, 2019, the trial court conducted an adjudicatory hearing where Mother and Father stipulated to a dependency finding regarding Dn.R. The trial court subsequently found Dn.R. to be a dependent child pursuant R.C. 2151.04 (C) and (D).

{¶7} On June 4, 2019, the trial court issued dispositional orders finding it in Dn.R.'s best interest to remain in the temporary custody of the Agency. Dn.R. was placed in foster care with Mother and Father having supervised visitations.

{¶8} On August 30, 2019, the Agency filed a motion for permanent custody of Dn.R., alleging that Mother's and Father's intellectual disabilities were so severe that they were unable to develop the basic parenting skills necessary to provide an adequate permanent home for Dn.R. The Agency further asserted that Mother and Father had failed to sufficiently progress in order for reunification with Dn.R. to be achieved in the foreseeable future. Consequently, the Agency maintained that Dn.R. cannot be placed with either parent within a reasonable amount of time and should not be placed with the parents.

{¶9} On January 7, 2020, the GAL filed her report, recommending that the trial court grant the Agency's motion for permanent custody of Dn.R.

{¶10} On January 14, 2020, the trial court commenced a four-day evidentiary hearing on the Agency's motion for permanent custody. The trial court heard testimony from numerous witnesses in support of the Agency's permanent custody motion, as well as testimony in opposition to the Agency's motion from Father, Mother, and one of the service providers working with the parents.

{¶11} On March 17, 2020, the trial court issued a judgment entry granting the Agency's motion for permanent custody of Dn.R. and terminating Mother's and Father's parental rights.

{¶12} Mother and Father each filed an appeal from the trial court's judgment entry granting permanent custody of Dn.R. to the Agency, asserting the following assignments of error for our review.

**MOTHER'S ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN DETERMINING THAT MOTHER HAS NOT PRESENTED SUFFICIENT EVIDENCE TO SHOW THE [SIC] NOTWITHSTANDING THE PRIOR TERMINATION SHE WAS ABLE TO PROVIDE A SECURE PERMANENT PLACEMENT AND ADEQUATE CARE.**

**MOTHER'S ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED IN ITS APPLICATION AND FACTUAL FINDINGS UNDER R.C. 2151.414(E)(1),(2) AND (11).**

**MOTHER'S ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ERRED IN FINDING THAT THE GRANT OF PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILD.**

**FATHER'S ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN DETERMINING THAT THE CHILD CANNOT BE PLACED WITH EITHER OF THE CHILD'S PARENTS WITHIN REASONABLE TIME OR SHOULD NOT BE PLACED WITH THE CHILD'S PARENTS PURSUANT TO R.C. 2151.414(B)(1)(A), AND THAT AS PART OF THAT DETERMINATION, ERRED IN DETERMINING**

**THAT R.C. 2151.414(E)(1),(2) AND (11) WERE ESTABLISHED IN THIS CASE.**

**FATHER'S ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED IN FINDING THAT THE GRANTING OF PERMANENT CUSTODY TO CHILDREN'S SERVICES WAS IN THE BEST INTEREST OF THE CHILD.**

{¶13} For ease of discussion, we elect to address the assignments of error together due to their interrelated nature.

{¶14} On appeal, Mother and Father challenge the trial court's decision to grant the Agency's motion for permanent custody of Dn.R. Specifically, Mother and Father contend that the trial court's findings in the judgment entry are against the manifest weight of the evidence.

*Relevant Authority*

{¶15} Revised Code Section 2151.414 contains procedures that protect the interests of parents and children in a permanent custody proceeding. *See In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. This section of the Revised Code requires that before a juvenile court may terminate parental rights and award permanent custody of a child to the moving agency, it must find clear and convincing evidence of two prongs of the permanent custody test, as required under R.C. 2151.414(B). *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 9 (2004). Specifically, the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and the trial court must find that permanent custody is in the best interest of

the child. *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10, citing *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 10 and *In re Brown*, 98 Ohio App.3d 337, 343 (3d Dist.1994).

*Standard of Review*

{¶16} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶17} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. "Clear and convincing evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in

criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, (1986).

{¶18} In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). *Accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) (Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M., M.M., D.M., B.M.*, 4th Dist. Athens Nos. 12CA43, 12CA44, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶19} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. No.2016CA00124, 2016-Ohio-7057, ¶ 20, citing *Miller v. Miller*, 37 Ohio St.3d 71 (1988). A reviewing court should find a trial

court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Thompkins* at 387, quoting *Martin* at 175.

*Evidence Adduced at the Permanent Custody Hearing*

{¶20} Prior to the presentation of evidence, the parties stipulated on the record that Mother and Father have intellectual disabilities that qualify them for services with the SCBDD. Specifically, the record establishes that Mother has a full scale IQ of 75 and suffers from fetal alcohol syndrome, and Father has a full scale IQ of 65. The parties further stipulated that Mother and Father had two older children who were both found to be dependent by the trial court and that Mother's and Father's parental rights were involuntarily terminated with respect to those children.[1]

{¶21} At the permanent custody hearing, the Agency presented the testimony of eleven witnesses all of whom were involved in this case to differing degrees.[2] Wesley Branscum, the ongoing caseworker, testified that the Agency became involved with Dn.R. immediately after his birth based upon the circumstances of

---

[1] The parents' first child together, D.R., was born in December of 2014. Permanent custody of D.R. was granted to the Agency on November 6, 2017. *See In re D.R.*, 3d Dist. Shelby No. 17-17-18, 2018-Ohio-3434 (affirming the trial court's grant of permanent custody). The parents' second child together, Da.R., was born in July of 2016. Permanent custody of Da.R. was granted to the Agency on August 21, 2018. *See In re Da.R.*, 3d Dist. Shelby No. 17-18-13, 2019-Ohio-2270 (affirming the trial court's grant of permanent custody). In addition to Dn.R., the child who is the subject of this case, the record further indicates that Mother was pregnant with the parents' fourth child (due in March of 2020) at the time of the permanent custody hearing in this case.

[2] Due to duplicative nature of much of this testimony, we find it sufficient to highlight only the testimony of those witnesses that had the greatest relevancy to the issues presented on appeal.

the Agency's prior history with Mother and Father. Branscum recalled that Dn.R. was placed in foster care after being discharged from the hospital because no appropriate family placements were available. Branscum explained that the Agency's primary concern was whether the parents could adequately care for Dn.R.'s basic needs and provide him a safe and secure home, both of which the parents failed to achieve in the prior cases involving Dn.R.'s older siblings. The Agency devised a case plan to address these issues which involved individualized one-on-one parenting coaching, parenting classes, mental health counseling, and monthly primary care meetings where various individuals involved in the case met to assess the parents' progress with the case plan and the ultimate goal of reunification.

{¶22} The testimony from several witnesses at the permanent custody hearing revealed that despite the individualized attention, Mother and Father failed to grasp and/or retain crucial information to demonstrate that they could develop the necessary parenting skills to safely parent Dn.R. in their home within a reasonable amount of time. One such witness was Amy Swaney, a home coach who worked one-on-one with Mother and Father to provide them with basic parenting tools and resources to help them be reunited with Dn.R.

{¶23} Swaney recalled that she first became involved in the case on March 10, 2019, three days after Mother gave birth to Dn.R. Swaney spent a significant

amount of time with Mother, Father, and Dn.R. during the pendency of this case, attending Mother and Father's approximately 115 supervised visitations with Dn.R. and observing the parents interact with Dn.R. She testified that from the outset Mother and Father had trouble comprehending the appropriate ways to feed, diaper, and hold the newborn.

{¶24} At three-months-old Dn.R. was diagnosed with torticollis, tracheomalacia, laryngomalacia, and other low muscle tone issues causing him to have developmental delays. Through the Agency, Dn.R. was provided physical therapy and other interventions to assist with his development. Swaney recalled that a few of these therapists attended the supervised visitations to show Mother and Father how to perform the therapeutic exercises on Dn.R. Swaney observed the parents struggle with understanding the strategies implemented by the therapists. Swaney's testimony regarding the parents lack of understanding of the therapy was bolstered by the testimony of two therapists who recalled similar observations of the parents. Swaney remarked that in subsequent supervised visitations with Dn.R., the parents often forgot to perform the exercises, which according to the therapists needed to be done consistently in order for Dn.R. to reap the benefit from them. Swaney recalled that when the parents did perform the exercises they would get flustered and give up doing the exercises if Dn.R. began to fuss.

{¶25} As time passed and Dn.R. grew, many of his developmental delays began to resolve. Swaney acknowledged that some of the parents' initial issues with diapering and bottle feeding improved over time, but only with her constant prompting, redirection, and support. Nevertheless, Swaney still expressed concern with Mother's and Father's ability to recognize when Dn.R. is hungry and to prevent him from choking as he moved to eating solid foods. She recalled a specific visitation in January 2020, at the time of the permanent custody proceedings, during which the parents failed to observe Dn.R. choking on his food. She explained that Dn.R. had a cold and was having difficulty eating while congested. Swaney intervened and directed the parents to stop feeding Dn.R. and take the food out of his mouth because he could not breathe and swallow the food at the same time.

{¶26} Swaney was also concerned with the inability of Mother and Father to anticipate Dn.R.'s safety concerns as he matured and developed. Swaney observed that Mother and Father struggled to absorb changing information regarding to how to meet a growing infant's basic needs. Swaney attempted to prepare Mother and Father for the prospect of Dn.R. returning to their home by going through several scenarios at home, such as administering Tylenol, taking his temperature, knowing when to call the doctor or what to do in a medical emergency. Swaney testified that over the course of several months, she gave Mother and Father handouts, showed them videos, and ran through scenarios with them one-on-one. All of these efforts

garnered little improvement with Mother's and Father's comprehension and/or ability to retain the information. Swaney testified that although Mother and Father put forth their best efforts to learn the basic parenting skills necessary to parent Dn.R. in their home, she believed that Mother and Father would not be able to demonstrate the requisite ability to safely care for Dn.R. in a reasonable amount of time. Notably, Swaney's sentiments in this respect were echoed by the testimony of several other service providers involved in this case.

{¶27} The Agency also presented the testimony of Hiliary Brandewie, Dn.R.'s foster parent. Brandewie recalled that Dn.R. was placed in her home upon being discharged from the hospital after his birth. She testified that the parents accompanied her to most of Dn.R. medical appointments and she observed Mother's struggle to comprehend and retain the doctor's information and advice. When Dn.R. was three-months-old, Brandewie began to notice some developmental delays. Specifically, she noticed that Dn.R. did not smile, he did not coo, and he generally "wasn't just acting like a normal, little baby should." (Trans. at 663).

{¶28} Brandewie sought assistance from Help Me Grow, who arranged for physical therapy. Brandewie testified that doing the therapeutic exercises with Dn.R. multiple times a day helped him make significant progress in reaching his developmental milestones. She explained that the exercises although simple were required to be performed consistently on a daily basis. Brandewie recalled a few

visitations where she, Mother, and Father met with the therapists from Help Me Grow to learn the exercises. Brandewie observed Mother and Father struggle to understand the therapists' directions. She expressed concern with Mother's and Father's ability to follow through with repeating the exercises as prescribed by the therapists. Notably, both of the therapists who testified at the permanent custody hearing reiterated that without consistent daily implementation of the therapeutic exercises, Dn.R.'s developmental delays would be further exacerbated.

{¶29} Brandewie also expressed concern with Mother and Father knowing when to seek medical attention and/or properly follow through with medical advice. She recalled a specific example when Dn.R. had some respiratory issues as a result of being ill. She explained that the doctor had initially diagnosed Dn.R. with RSV, a respiratory virus, and prescribed breathing treatments with specific instructions to return in three days if Dn.R.'s condition had not improved. Brandewie sent the equipment and medicine for the breathing treatments to the visitation with the parents so that they could learn how to administer them. Swaney, who observed the parents try to administer the breathing treatments, testified that Mother and Father had difficulty effectively giving Dn.R. the breathing treatment despite being shown how to use the machine. Swaney further recalled that instead of recognizing that they were using the machine incorrectly, Mother and Father insisted that they knew

how to give the breathing treatments because one of their other children had used a breathing machine in the past.

{¶30} This notwithstanding, Brandewie explained that she took Dn.R. back to the doctor because his condition did not improve. The doctor changed Dn.R.'s diagnosis to bronchiolitis and informed her that the breathing treatments were no longer needed. However, Brandewie recalled that Mother and Father struggled to understand why the breathing treatments were not being done and wanted to keep administering them despite the doctor's orders.

{¶31} For their part, the parents appeared to acknowledge that they needed assistance to be able to parent Dn.R. in their home. In support of their case in opposition to the Agency's motion for permanent custody, the parents sought to establish that Mother qualified for 24-hour assistance through the SCBDD to help her parent Dn.R. in their home.

{¶32} Specifically, the trial court heard testimony from Mother's and Father's Service and Support Administrators ("SSAs"), who were assigned to work with them through the SCBDD. These witnesses testified to the support structure currently in place to assist Mother and Father in meeting their *own* basic needs in the home where they reside together. In particular, the SCBDD coordinated with a third party called REM, that acts as a payee for Mother and Father to ensure their bills are paid on time and to help them manage their finances. REM also sends a

staff person to assist Mother and Father by taking them grocery shopping, helping them with housework, and driving them to various appointments.

{¶33} Julie Maurer, Mother's SSA, testified that currently Mother receives ten hours a week of assistance from REM. Maurer explained that in anticipation of Dn.R. potentially living in the home, she was able to secure additional funding to have a staff person in the home 24 hours a day, seven days a week. However, Maurer acknowledged that the nature of this assistance is only focused on Mother and her abilities, and not on ascertaining what is in the best interest of Dn.R. She clarified that REM would only intervene in Dn.R.'s care if a "life and death situation" occurred, otherwise their staff would report any issue to the SCBDD before intervening. (Trans. at 218). Maurer further explained that Mother's participation in this program is voluntary and that Mother can refuse or opt out of the program at any time.

{¶34} Moreover, Maurer stated that Mother's eligibility for the funding for the 24-hour care must be reevaluated on a yearly basis and that the goal would be to reduce the amount of services provided if it were determined that Mother could safely parent without continuous assistance due to the high cost of the care. Maurer further clarified that although the SCBDD currently uses 24-hour care with some of their clients, none of those clients have children in the home. She stated that she

was not aware of any situation where this level of care had been implemented to assist a client in raising a child to the age of majority.

{¶35} Turning now to the assignments of error raised on appeal.

*Mother's First and Second Assignments of Error*
*Father's First Assignment of Error*

{¶36} In these assignments of error, Mother and Father contend the trial court erred when it determined that the Agency had proved by clear and convincing evidence that Dn.R. cannot be placed with either parent within a reasonable time and should not be placed with the parents under R.C. 2151.414(E)(1) and (2). Mother and Father further argue that the trial court erred when it found they had failed establish by clear and convincing evidence, that notwithstanding the prior terminations of their parental rights with respect to Dn.R.'s two older siblings, they can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of Dn.R. *See* R.C. 2151.414(E)(11)

1. *Permanent Custody Test: First Prong—R.C. 2151.414(B)(1)*

{¶37} The first prong of the test requires a finding by clear and convincing evidence that there exists one of the statutorily-prescribed situations of R.C. 2151.414(B)(1):

> **(a)   The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b)   The child is abandoned.**

**(c)    The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)    The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \*.**

**(e)    The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.**

R.C. 2151.414(B)(1).

**{¶38}** In the instant case, the trial court found R.C. 2151.414(B)(1)(a) to be applicable.  Prior to making a finding that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, the statute directs the trial court to consider all the relevant factors listed in R.C. 2151.414(E).

**{¶39}** Here, the trial court found that the following statutory factors supported its finding that Dn.R. cannot be placed with either parent within a reasonable time and should not be placed with the parents.

**(1)    Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental**

-18-

**utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

**\* \* \***

**(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.**

R.C. 2151.414.

{¶40} Specifically, the trial court made the following findings in its judgment entry granting the Agency's motion for permanent custody.

**Since the start of visitation, minimal progress was made towards the main case plan goals by Felicity and Joshua. There continued to be issues regarding feeding, dressing, medication and other basic care issues of Dn.R. There are also valid concerns about Felicity and Joshua's ability to properly meet the medical and emergency needs of Dn.R. Felicity and Joshua are dependent on government services to help them provide for their own basic needs, and have not evidenced the ability to provide for the needs of a young child. A fundamental problem throughout the case**

**plan services was that both parents had to be reminded and re-educated on a wide variety of issues that needed to be addressed, and, as a result, real progress has not been made. Valid concerns were raised regarding the fact that each parent had to be re-directed to focus on the appropriate task that was needed. The lack of ability to focus was also evident to this Court in observing the court testimony of both parents**.

**\* \* \***

**The concerns regarding the inabilities of each parent to meet the plan goals is also underscored by the fact each parent had already participated in these types of services in the two prior permanent custody cases. Although the parents imply that the case plan services were not implemented in the best method to address their disabilities that does not mean that they have met the burden of proof—by either proper completion of the services or by making their own arrangements to offer suitable proof of their parenting abilities to the Court. The Court also finds that the case plan was reasonable and that suitable consideration was given to the abilities of each parent when working towards the case plan goals.**

**\* \* \***

**Overall, the State's witnesses were credible, consistent and clear that: 1) neither parent would be likely to be able meet the goals of the case plan if given more time; or, at best, 2) they couldn't say if a parent was capable of meeting the goals of the case plan if given more time. There was little or no evidence that more time spent working the case plan would achieve the needed goals.**

**Home Coach Amy Swaney's testimony was credible and particularly noteworthy. She had the most frequent and close contact with the parents as part of her working with them multiple times a week at visitations on the parenting issues that needed to be addressed. The State's witness and the parties themselves acknowledged that she had worked very closely and significantly with the parents to achieve these goals. She was uniformly praised for her sincere and well-intentioned efforts to help each parent achieve the goal of reunification with the child.**

> **The Court finds that her efforts were appropriate and well-intentioned. Regardless of those efforts Amy Swaney was credible and clear in her testimony that the parents had still not evidenced the ability to provide adequate basic care for the health, safety and welfare of the child and that, based upon her observation that would not likely get better.**

(Doc. No. 239 at 6-8).

{¶41} On appeal, Mother and Father argue that the trial court erred in granting the motion for permanent custody because the Agency failed to give them the ample opportunity to parent Dn.R. In particular, Father contends that the parents should be given six additional months to demonstrate their ability to learn basic parenting skills. In making these arguments, Mother and Father overlook the fact that they are not *new* parents. The record establishes that the parents were given the opportunity to demonstrate their ability to provide a safe and permanent home for two other children, one of which lived in their home for nearly eight months before being removed. Nevertheless, the parents demonstrated the same struggles in those cases as they have in this one.

{¶42} This notwithstanding, the record establishes that the Agency provided the parents with a significant amount of appropriate resources to assist them in developing the requisite parenting skills to reunite with Dn.R. Unfortunately, the evidence reveals that the parents were unable to make the necessary progress in order for Dn.R. to safely return to their home within a reasonable timeframe. Accordingly, we conclude that the record supports the trial court's findings that

Dn.R. cannot be placed with either parent within a reasonable time and should not be placed with the parents under R.C. 2151.414(E)(1) and (2).

**{¶43}** The trial court also found R.C. 2151.414(E)(11) applicable in determining that Dn.R. cannot be placed with either parent within a reasonable time and should not be placed with the parents. Specifically, R.C. 2151.414(E)(11) permits the trial court to make this determination when a party's parental rights were previously involuntarily terminated as to other children. Under R.C. 2151.414(E)(11), "the burden is on the parent to provide clear and convincing evidence to prove that he or she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." *In re: Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 14, citing *In re J.H.*, 8th Dist. Cuyahoga No. 105055, 2017-Ohio-940, ¶ 22.

**{¶44}** On appeal, Mother and Father contend that the trial court erred in granting the motion for permanent custody because they demonstrated at the permanent custody hearing that 24-hour in-home support could be put in place through REM to assist them with parenting Dn.R. Therefore, Mother and Father maintain the record demonstrates that they have met their burden in establishing that they can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of Dn.R., notwithstanding the prior terminations of their parental rights.

{¶45} The trial court specifically addressed the evidence pertaining to REM and the plan for the 24-hour in-home assistance in its judgment entry granting the motion for permanent custody.

> **Testimony by the SSA's and REM representative indicate that the parents may now be able to qualify for "around the clock, 24/7 services" if the child is placed in their home. In other words, the parents would have someone in the house with them at all times. This program is not guaranteed on an ongoing basis, but is substantially more than REM is currently or has ever provided to the parents. However, if both parents are working and the child is at home REM was unclear as to how that situation would be handled. REM does not take responsibility for the child. These services would also only be offered to benefit the Mother, not the Father.**
>
> **Importantly, however, is that REM continues to make it clear that its focus is only on the needs of the parents, not a child. It was made clear to the Court that REM would not intervene on parenting issues or problems and would only take action to seek emergency medical attention if the child was in a 'life or death' situation. Unfortunately, that does not help to reliably address almost every other instance of improper childcare arising from problems like identifying medical conditions, medication dosages, untreated medical problems, malnutrition, child safety and an endless list of other problems that a child can experience as a result of parenting mistakes. REM would also have no legal obligation to assist in meeting the health, welfare and safety of the child. REM would be subject to a parent's decisions (or lack thereof) regarding child care. There is no reliable evidence that this expanded service would overcome the fundamental concerns in this case.**

(Doc. No. 239 at 9).

{¶46} In addition to supporting the trial court's observations of the evidence above, the record further demonstrates that the dependability of REM services

and/or the parents' ability to coordinate with REM raised concerns in this case. Throughout the pendency of the case, the parents had missed appointments with service providers and visitations with Dn.R., which the parents blamed on REM or other service providers for failing to provide them with transportation. One such incident occurred during the trial court proceedings when REM failed to transport the parents to the permanent custody hearing. The issue was resolved by delaying the proceedings to allow for Mother's trial counsel to pick up the parents and bring them to the hearing. While the incident itself did not bare significant consequences, it nevertheless amplified the dependability concerns underlying the parents use of REM to assist them with parenting a young child in their home.

{¶47} Based on the foregoing, we conclude that the record supports the trial court's determination that the Agency proved by clear and convincing evidence that Dn.R. cannot be placed with either parent within a reasonable time or should not be placed with his parents under R.C. 2151.414(E)(1) and (2). We also conclude that the record supports the trial court's determination that Mother and Father failed establish by clear and convincing evidence, that notwithstanding the prior terminations of their parental rights with respect to Dn.R.'s two older siblings, they can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of Dn.R.

{¶48} Accordingly, Mother's first and second assignments of error are overruled, and Father's first assignment of error is overruled.

*Mother's Third Assignment of Error*
*Father's Second Assignment of Error*

*2. Permanent Custody Test: Second Prong—Best Interest of the Child*

{¶49} "If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency's permanent custody of the child is in the child's best interest." *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; *see* R.C. 2151.414(B)(1). The best interest determination is based on an analysis of R.C. 2151.414(D).

{¶50} Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors. *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12, 8-13-14, 2014-Ohio-755, ¶ 27. The factors of R.C. 2151.414(D)(1) include:

> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D)(1).

{¶51} Under this test, the trial court considers the totality of the circumstances when making its best interest determination and no single factor is given greater weight than others by the statute. *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56 (2006); *In re Z.Y.*, 8th Dist. Cuyahoga No. 86293, 2006-Ohio-300, ¶ 13.

{¶52} On appeal, Mother maintains that the trial court failed to give adequate consideration to the 24-hour in-home support option prior to granting the Agency's motion for permanent custody. As discussed in our resolution of Mother's first assignment of error, we concur with the trial court's finding that the evidence failed to establish the expanded REM service would be reliable and sufficient overcome the fundamental safety concerns in this case. This notwithstanding, the trial court further found "that the proposed increase in services by REM only comes at the end of this case, is speculative in its success, and simply doesn't provide any assurance

that if the parents consistently continue to fail to meet the child's basic needs that REM would [be] of any benefit *to the child*." (Doc. No. 239 at 9) (emphasis sic).

{¶53} Our review of the evidence at the permanent custody hearing supports the trial court's concern with speculative success of the proposed increase in REM services. As such, we do not find the availability of this option to be a sufficient basis to conclude that the trial court erred in determining that Dn.R.'s need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to the agency under R.C. 2151.414(D)(1)(d).

{¶54} Mother and Father also point to the evidence in the record indicating that the parents have demonstrated their commitment to being reunited with Dn.R. by participating in the services provided to them in the case plan as well as the bond between the parents and Dn.R. that had been cultivated in the 115 visitations over the period of several months. While the trial court acknowledged this effort and bond in its judgment granting permanent custody, it noted that Dn.R.'s need for a legally secure permanent placement was the paramount concern:

> **Dn.R. has been in the care of the SCDJFS-CSD all of his young life. He is now 1 year old. He is in need of long term stability and the Court finds it would be detrimental to Dn.R. to allow this situation to continue or to return him to his parents. There is simply no indication that further case plan efforts with the [sic] either parent would be beneficial to Dn.R. His placement in foster care has been a positive effect on his health and overall well-being.**
>
> * * *

> **Although this Court's decision finds the evidence overwhelmingly in support of SCDJFS-CSD's motion it should be noted that the findings are not a determination by this Court of any malice or improper intentions toward Dn.R. on the part of the parents. On the contrary, these parents love their child and, despite their inabilities and lack of success in achieving the case plan goals, they do not want to lose their child. The Court acknowledges how disheartening and frustrating this process has been for the parents. As a matter of law, however, the Court's decision cannot be based upon what is best for the parents.**

(Doc. No. 239 at 10).

**{¶55}** The trial court further noted, and the record reflects, that Dn.R. was well-bonded with his foster parents and that in their home he had overcome many of his developmental delays and continued to thrive. Brandewie, Dn.R.'s foster mother, expressed a desire to adopt Dn.R. although she clarified that no such discussions with the Agency have taken place.

**{¶56}** Based on the foregoing, we conclude that the record supports the trial court's determination that it is in Dn.R.'s best interest to grant the Agency's motion for permanent custody. Accordingly, Mother's third assignment of error is overruled and Father's second assignment of error is overruled.

**{¶57}** For all these reasons, Mother's and Father's assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**

Case No. 17-20-06