[Cite as *In re J.H.*, 2026-Ohio-1333.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

    J.H.,

**ADJUDICATED DEPENDENT
AND ABUSED CHILD.**

**[JESSICA W. - APPELLANT]**

CASE NO. 1-25-40

**OPINION AND
JUDGMENT ENTRY**

**Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2023 JG 38839**

**Judgment Affirmed**

**Date of Decision: April 13, 2026**

**APPEARANCES:**

    *Michael G. Aird* **for Appellant**

    *Ashley R. Stansbery* **for Appellee**

**MILLER, J.**

{¶1} Mother-appellant, Jessica W., appeals the July 3, 2025 judgment of the Allen County Court of Common Pleas, Juvenile Division, granting permanent custody of her biological son, J.H., to appellee, Allen County Children Services Board ("the Agency"). For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Jessica is the biological mother of J.H., born August 2023.[1] The Agency became involved with J.H. at the time of his birth due to Jessica testing positive for amphetamine, cocaine, fentanyl, and marijuana upon her admission to give birth to J.H. Further, Jessica admitted to drinking approximately five alcoholic shots and two beers weekly during her pregnancy. After J.H.'s birth, his cord blood tested positive for fentanyl, cocaine, methamphetamine, and marijuana, and J.H. was treated for withdrawal.

{¶3} At the shelter care hearing on August 23, 2023, the trial court granted the Agency's request to place J.H. in the temporary custody of the Agency. The following day, the Agency filed a complaint alleging that J.H. is a dependent and abused child pursuant to R.C. 2151.04(C) and 2151.031(D), respectively.

---

[1] Jessica initially identified Justin H. as the biological father of J.H. and Justin was added to the case plan. However, subsequent DNA testing determined that Justin was not the biological father of J.H. and, in a January 17, 2025 judgment entry, he was dismissed as a party. Presently, the identity of J.H.'s biological father is unknown.

{¶4} At the adjudication hearing held on October 3, 2023, the magistrate found that J.H. was a dependent and abused child as alleged in the Agency's complaint. On October 17, 2023, the trial court adopted the magistrate's findings of fact and conclusions of law.

{¶5} The dispositional hearing was held on November 14, 2023 wherein the magistrate recommended to continue J.H. in the temporary custody of the Agency with the parents permitted supervised visitation at the Agency. On December 5, 2023, the trial court adopted the magistrate's findings of fact and conclusions of law and continued the child in the temporary custody of the Agency.

{¶6} Thereafter, the parties continued to work the case plan. However, on March 13, 2025, the Agency filed a motion requesting permanent custody of J.H. A hearing was held on June 11, 2025. At the hearing, the Agency presented the testimony of the two caseworkers assigned to the case. Jessica rested without presenting testimony or other evidence. On July 3, 2025, the trial court filed its judgment entry granting the Agency permanent custody of J.H.

{¶7} On July 15, 2025, Jessica filed her notice of appeal. She raises two assignments of error for our review. For ease of discussion, we will address her assignments of error in reverse order.

## Second Assignment of Error

**The trial court's decision to grant the Agency's motion for permanent custody is against the manifest weight of the evidence.**

{¶8} In her second assignment of error, Jessica argues that the trial court erred by finding that the Agency proved by clear and convincing evidence that the Agency should be granted permanent custody of J.H.

*Manifest-Weight Review of Permanent-Custody Decisions*

{¶9} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court '"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *In re Dn.R.*, 2020-Ohio-6794, ¶ 16 (3d Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001).

{¶10} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.

It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 25 Ohio B. 150 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶11} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 2016-Ohio-7057, ¶ 20 (5th Dist.). "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the '"exceptional case in which the evidence weighs heavily against the [decision]."'" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio

St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215 (1st Dist. 1983).

*Standard & Procedures for the Termination of Parental Rights*

{¶12} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶13} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 2018-Ohio-125, ¶ 12 (3d Dist.), citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 2015-Ohio-2740, ¶ 13 (3d Dist.). "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies,

and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 2017-Ohio-4218, ¶ 10 (3d Dist.).

As relevant to this case, R.C. 2151.414(B)(1) provides:

[T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

. . .

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period[.]

R.C. 2151.414(B)(1)(d).

{¶14} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 2017-Ohio-142, ¶ 23 (3d Dist.), quoting *In re A.F.*, 2012-Ohio-1137, ¶ 55 (3d Dist.) and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

{¶15} "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.*

at ¶ 24, citing *In re H.M.*, 2014-Ohio-755, ¶ 27 (3d Dist.). The factors specifically listed in R.C. 2151.414(D)(1) are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private placing agencies for twelve or more months of a consecutive twenty-two month period . . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

*Analysis*

{¶16} Jessica does not dispute that J.H. has been in the Department's temporary custody for 12 or more months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. Therefore, she does not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to J.H.

-8-

Rather, in her assignment of error, Jessica argues that the trial court erred by determining that granting the Agency permanent custody is in J.H.'s best interest. However, after examining the trial court's findings and reviewing the record, we conclude that clear and convincing evidence supports the trial court's best-interest determination.

*R.C. 2151.414(D)(1)(a)*

> With respect to R.C. 2151.414(D)(1)(a), the trial court found:
>
> The Court finds that the Minor Child has been in the temporary custody of the Agency, since August 23, 2023. The Child has been with the same foster family since mid-January 2025, the same foster family that the Child was initially placed with at the time of discharge from the hospital. The Court finds that the Child is adjusted to the Child's placement and appears happy and comfortable. . . . The Court further finds that the Child is bonded with the foster family and the other children within the home.

(July 3, 2025 Judgment Entry).

{¶17} The undisputed evidence presented at hearing demonstrated that J.H. was placed into the temporary care of the Agency and placed with a foster family, immediately upon his release from the hospital following his birth and 14 days in the special care nursey. According to the Agency caseworkers who testified at the permanent-custody hearing, J.H. remained with the foster family until March 2024 when J.H. was moved into the home of Whitney Johnson ("Johnson"), a cousin of Justin H., the man who was alleged to be J.H.'s biological father at that time. However, in January 2025, shortly after Justin was determined not to be the

biological father of J.H., J.H. was returned to his previous foster family, where he remained at the time of the hearing.

**{¶18}** J.H.'s caseworkers testified that J.H. has a "strong bond" with the members of his foster family and that they seem "very bonded together." (June 11, 2025 Tr. at 42). Moreover, the foster family speaks positively about J.H. The foster family stated that they had a very strong bond with him before he went to live with Johnson, and they were "very happy" when J.H. was subsequently returned to the home because they "felt like he was family." (*Id.* at 43). His caseworker testified that the foster family was very involved with J.H. from the time that he was born and that, if the opportunity would arise, they would be interested in adopting him. (*Id.*).

**{¶19}** With respect to J.H.'s visits with Jessica, the caseworkers testified that for approximately the first year of the case, Jessica was still battling addiction and made little effort to work the case plan or to become involved in J.H.'s life. Moreover, Jessica was in and out of incarceration during that time. However, after Jessica successfully completed a drug-treatment program at the WORTH Center in August 2024, she appeared to turn a corner and began working the case plan and making an attempt to be involved in J.H.'s life.

**{¶20}** According to the caseworkers, Jessica exercised approximately two hours per week of supervised visitation. The caseworker described the visits

between J.H. and Jessica as "going fine" and reported that J.H. "is happy" at the visits. However, the caseworker testified that "the bond between them is not strong." (June 11, 2025 Tr. at 66).

{¶21} Based on the evidence presented at trial, it is clear that J.H. has a strong bond with his foster family who have known him since the time of his birth. Further, it is clear that the foster family considers J.H. to be a member of their family and that they feel bonded to him. However, the evidence indicates that the bond between J.H. and Jessica is not strong due to Jessica's failure to work the case plan for the first year and the corresponding lack of time that the pair has had to bond as a result. Accordingly, the record supports the trial court's findings under R.C. 2151.414(D)(1)(a).

*R.C. 2151.414(D)(1)(b)*

{¶22} With respect to R.C. 2151.414(D)(1)(b), at the time of the hearing, J.H. was less than two years old, and as such, was unable to articulate his wishes to the court or to the guardian ad litem. However, as indicated by the trial court in its judgment entry granting permanent custody, the guardian ad litem recommended the award of permanent custody to the Agency and the termination of parental rights as being in J.H.'s best interest, a finding that was consistent with the guardian ad litem's testimony to the court.

*R.C. 2151.414(D)(1)(c)*

{¶23} The trial court made the following findings with respect to R.C. 2151.414(D)(1)(c):

> [T]he Court finds that the Child was previously removed from the mother's care and custody on August 23, 2023, and placed into the Temporary Custody of the Agency. The Court finds that the Child has been outside of the care and custody of the Mother since August 23, 2023, on a consecutive basis. The Court also finds that the Child has not been able to be returned to the Mother since August 23, 2023.

(July 3, 2025 Judgment Entry).

{¶24} At the hearing, the Agency presented undisputed evidence that J.H. has remained in the temporary custody of the Agency since the time of his release from the hospital following his birth. Accordingly, the trial court's findings with R.C. 2151.414(D)(1)(C) are supported by the record.

*R.C. 2151.414(D)(1)(d)*

{¶25} With respect to R.C. 2151.414(D)(1)(d), the trial court found that "the Child is in need of a legally secure permanent placement, and no such placement can be achieved without a grant of permanent custody to the Agency." (July 3, 2025 Judgment Entry).

{¶26} As mentioned, the Agency presented testimony that J.H. had been in the care of the Agency since his release from the hospital following his birth. Throughout the first year of the case plan, Jessica was still actively using illegal substances and was in and out of incarceration. Accordingly, Jessica made very little progress toward the case plan objectives during this time.

{¶27} However, the caseworkers testified that Jessica turned a corner after successfully completing a treatment program at the WORTH Center in August 2024. Upon her release from the WORTH Center, Jessica began residing at Andrew's House of Hope, a sober-living facility for women who are struggling with substance abuse and are trying to remain sober.

{¶28} According to the Agency caseworkers, Jessica has been receiving services at BrightView and has remained largely compliant with the treatment recommendations since her release from the WORTH Center. However, Jessica has had three positive drug screens since she has been involved at Andrew's House of Hope. According to an Agency caseworker, the three positive screens, which occurred in October 2024, January 2025, and April 2025, were positive for substances such as gabapentin, fentanyl, and cocaine. However, during each of the drug screens, Jessica denied using the substances and did not take responsibility for the positive drug screens, instead arguing that the results were false positives.

{¶29} During the first year of the case plan, Jessica's interactions with J.H. were limited, due in large part to her substance use and Jessica remaining in and out of incarceration for drug-related offenses and probation violations. However, upon her successful completion of the treatment program at the WORTH Center, Jessica became more consistent with visitations with J.H.

{¶30} When J.H. was in the care of Johnson, Jessica and Johnson arranged visitations between Jessica and J.H. with Johnson acting as a supervisor. Unfortunately, Jessica and Johnson had some scheduling conflicts and there was a period of time when Johnson was unable to contact Jessica due to Jessica not providing Johnson or the Agency with her telephone number. However, an Agency caseworker testified that they were not aware of any concerns resulting from those visits.

{¶31} Once J.H. was returned to the care of the foster family, Jessica exercised weekly two-hour supervised visitations with J.H. According to the supervising caseworker, the visits went well and the Agency did not have any concerns regarding the interactions between Jessica and J.H. However, the caseworker testified that she did not perceive the bond between the mother and son as being strong. Additionally, out of the 17 possible visits with J.H., Jessica missed 6 visits, including the most recent visit prior to the hearing.

{¶32} According to the caseworker, Jessica began working part-time bartending at a local bowling alley and recently obtained a vehicle. The caseworker testified that although the part-time job may not, on its own, be sufficient to support Jessica and J.H., that with available assistance, she may be able to financially support herself and J.H.

{¶33} The Agency caseworker testified that its biggest concern relating to Jessica is that children are not permitted to reside at Andrew's House of Hope and, accordingly, Jessica is unable to have J.H. live with her at her current residence. Furthermore, although the caseworker testified that she has had many conversations with Jessica regarding the issue, Jessica had not taken steps to obtain other housing and seemed content to remain living at Andrew's House of Hope. Notably, Jessica was not court-ordered to remain at Andrew's House of Hope and voluntarily chose to live there despite the residence's policy against allowing children to reside in the sober-living facility.

{¶34} Accordingly, we find that that the trial court's finding that J.H. cannot be reunited with Jessica within a reasonable time is supported by the record. At the time of the permanent-custody hearing, J.H. had been in the temporary custody of the Agency for nearly two years. Yet, Jessica was still not presently in a position to provide for the basic needs of her child. Furthermore, no evidence was presented to contradict the Agency's testimony that Jessica would not soon be in a position to reunite with J.H. and to meet his basic needs.

*R.C. 2151.414(D)(1)(e)*

{¶35} With respect to R.C. 2151.414(D)(1)(e), the court found that "none of the other factors set forth in R.C. 2151.414(E)(7-11) are present, save and except

for the finding that the Mother and the Unknown/Unnamed Father have abandoned the child." (July 3, 2025 Judgment Entry).

{¶36} The trial court's finding that Jessica had abandoned the child appears to result from Jessica's lack of involvement with J.H. or the case plan during the first year J.H.'s life.

*Conclusion*

{¶37} In sum, competent and credible evidence supports each of the trial court's best-interest findings. Considering the evidence of J.H.'s bond with the foster family and lack of bond between Jessica and J.H., the length of time J.H. had been in the Agency's custody, Jessica's failure to make meaningful progress on the case plan during the first year, and Jessica's failure to find housing that can accommodate J.H. supports the trial court's determination that granting permanent custody of J.H. to the Agency was in the child's best interest. Therefore, we conclude the trial court's decision awarding permanent custody of J.H. to the Agency is not against the manifest weight of the evidence.

{¶38} Jessica's second assignment of error is overruled.

**First Assignment of Error**

**The trial court erred by failing to grant Appellant's request for an extension to permit Appellant to obtain new housing.**

{¶39} In her first assignment of error, Jessica argues that the trial court erred by not granting her request for an extension to allow her to obtain new housing.

**{¶40}** At the conclusion of her closing argument at the June 11, 2025 permanent-custody hearing, Jessica's counsel made the following request:

> Your Honor, at this point, one (1) of the available alternatives to the Court is an extension. I understand, because of [prior counsel's] illness and my subsequent appointment, this got continued to an unideal time and that only gives two (2) months. But, I would ask the Court to grant us that two (2) months to see if she can get out, get housing, and continue to provide for this child, er-, begin to provide for this child, instead of terminating her parental rights, especially when she is very much on the upswing. If this progress were at the beginning of the case, or even six (6) months in, I believe the Agency-, and the-, I would like to thank the Agency for providing an accurate picture and for complimenting [Jessica] on the progress she's made. . . . If this were at the beginning of the case, . . . . we would be having a very different conversation. So, I would ask for a grant of extension. We do still have the six (6) month extension, which is only two (2) . . . . but we would ask for that in the alternative to permanent custody.

(June 11, 2025 Tr. at 87).

**{¶41}** The trial court took the matter, including Jessica's motion for an extension under advisement, but on July 3, 2025, the trial court filed its judgment entry granting the Agency's motion for permanent custody. On appeal, Jessica argues that the trial court should have granted her a two-month extension so that she could procure housing for herself and J.H.

**{¶42}** "The decision as to whether to grant a parent's request for an extension of temporary custody rather than granting permanent custody to the Agency is one left to the discretion of the trial court." *In re H.S.*, 2023-Ohio-3210, ¶ 32 (3d Dist.). R.C. 2151.415(D)(1) provides that "[t]he court may extend the temporary custody

order of the child for a period of up to six months, if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension."

{¶43} Jessica contends the trial court erred by granting permanent custody to the Agency rather than granting her motion to extend the Agency's temporary custody for two months. Specifically, she argues that, since her completion of the substance-abuse program and release from the WORTH Center, she has made significant progress on the case plan and that, if the trial court granted the extension, she would be able to be reunited with J.H. in that time.

{¶44} Indeed, the record demonstrates that Jessica did not meaningfully participate in the case plan during the first year. During that time, Jessica was incarcerated on four different occasions and was struggling with substance use. However, in August 2024, she was released from a residential-treatment program and began making process on the case plan.

{¶45} At the permanent-custody hearing, the caseworker testified that since that time, Jessica often tested negative for substances; however, the Agency was concerned about three positive drug screens that occurred in October 2024, January 2025, and April 2025 which were positive for substances such as gabapentin,

fentanyl, and cocaine. Despite the positive drug screens, Jessica denied using the substances and argued that each of the screens were false positives. The Agency expressed concern both regarding the positive screens and Jessica's apparent lack of accountability for them.

{¶46} However, the Agency argued that its biggest cause of concern was Jessica's housing situation. Following her release from the substance-treatment program, Jessica began residing at Andrew's House of Hope, a sober-living facility for women who struggle with substance abuse. However, children are not permitted to reside at Andrew's House of Hope; and, accordingly, J.H. would not have been permitted to reside with Jessica at that residence. According to the Agency's unrefuted testimony, Jessica's caseworker repeatedly discussed its concerns that J.H. could not reside with Jessica at her residence. Yet, Jessica did not attempt to procure housing that could accommodate J.H.

{¶47} Additionally, Jessica had obtained part-time employment as a bartender at a bowling alley. The Agency expressed concerns that Jessica, who also struggled with an alcohol-abuse disorder, was employed as a bartender. Jessica's caseworker testified that she did not believe Jessica's part-time employment would be sufficient, on its own, to allow Jessica to provide for herself and J.H. However, the caseworker testified that she believed Jessica would qualify for assistance that, combined with her income from her employment, would allow her to provide for

both herself and her son. But, at the time of the hearing, Jessica had not obtained that assistance. Additionally, Jessica's caseworker testified that her current part-time job is the only employment Jessica has held since the commencement of the case. Moreover, because she only held the job since February 2025, she had not demonstrated to the Agency that she was capable of maintaining employment for an extended period of time. The Agency also expressed concern that Jessica had identified having money as a "trigger" for her substance use.

{¶48} Furthermore, at the time of the hearing, J.H. had been in the Agency's custody since the time of his release from the hospital following his birth and had consistently been in the temporary custody of the Agency since that time. Thus, Jessica had at no time during his life demonstrated that she was capable of meeting his basic needs and, at the time of the hearing, had only spent time with J.H. in a supervised capacity.

{¶49} Accordingly, we do not find the trial court abused its discretion by denying Jessica's motion for an extension. Although the testimony presented at the hearing indicated Jessica made progress through some of her case objectives, we do not find the trial court abused its discretion by not granting Jessica's motion for an extension. There was reasonable cause to believe that J.H. would be reunited with Jessica in the two-month extension. Although Jessica now argues that the two-month extension would have allowed her to seek and obtain housing that would

allow a child, the undisputed testimony by the caseworker was that Jessica was aware that the Agency could not recommend reunification while she was living in a residence that did not allow children, Jessica chose to continue residing there nonetheless and did not seek alternative housing when she had the opportunity. It was not reasonable to expect Jessica could obtain housing, demonstrate that her new housing was stable and suitable for a child and that she was capable of meeting J.H.'s basic needs in the two-month extension she requested. Given the totality of the evidence presented at the permanent-custody hearing, the trial court did not abuse its discretion in denying Jessica's oral motion for an extension.

{¶50} Jessica's first assignment of error is overruled.

### Conclusion

{¶51} For the foregoing reasons, Jessica's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas, Juvenile Division.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WALDICK, J., concur.**

# __JUDGMENT ENTRY__

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.   The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

Mark C. Miller, Judge

William R. Zimmerman, Judge

Juergen A. Waldick, Judge

DATED:
/jlm